

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-14-1996

# Sheridan v. EI DuPont de Nemours

Precedential or Non-Precedential:

Docket 94-7509

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Sheridan v. EI DuPont de Nemours" (1996). *1996 Decisions.* Paper 26.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/26

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-7509


BARBARA R. SHERIDAN,
                              Appellant
                    v.

E.I. DUPONT DE NEMOURS AND COMPANY,
          JACQUES AMBLARD


On Appeal from the United States District Court
        for the District of Delaware
        (D. C. Civil No. 93-cv-00046)


Argued May 4, 1995

Before:  SLOVITER, Chief Judge, ALITO, Circuit Judge,
         and SCHWARZER, District Judge*


Reargued en banc May 14, 1996

Before:  SLOVITER, Chief Judge, BECKER, MANSMANN, GREENBERG,
         SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, MCKEE,
         and SAROKIN*, Circuit Judges

         (Opinion Filed November 14, 1996)


Thomas S. Neuberger  (Argued)
Wilmington, DE  19801-1646

Martin D. Haverly
Wilmington, DE    19801

   Attorneys for Appellant
_____

* Hon. William W Schwarzer, Senior United States District Judge,
  United States District Court for the Northern District of
  California, sitting by designation.
** Hon. H. Lee Sarokin heard argument but retired from office
  prior to the issuance of the opinion.

Raymond M. Ripple   (Argued)
Donna L. Goodman
E. I. DuPont de Nemours & Co.
  Legal Department
Wilmington, DE  19880-0036

    Attorneys for Appellees

Nancy Erika Smith
Neil Mullin
Lisa Manshel
Smith Mullin, P.C.
West Orange, NJ  07052

David Rocah
American Civil Liberties Union of N.J.
Newark, NJ  07102

    Attorneys for Amicus Curiae
    American Civil Liberties Union of N.J. in Support of Appellant

Elaine R. Jones
Theodore M. Shaw
Charles Stephen Ralston
NAACP Legal Defense and Educational Fund, Inc.
New York, NY  10013

    Attorneys for Amicus Curiae NAACP Legal Defense
    and Educational Fund in Support of Appellant

C. Gregory Stewart
Gwendolyn Young Reams
Carolyn L. Wheeler
Robert J. Gregory
Equal Employment Opportunity Commission
Washington, DC  20507

    Attorneys for Amicus Curiae Equal Employment
    Opportunity Commission in Support of Appellant

Alice Ballard
Samuel & Ballard
Philadelphia, PA  19102

Scott A. Burr
Alan B. Epstein
Jablon, Epstein, Wolf & Drucker
Philadelphia, PA  19102

    Attorneys for Amicus Curiae National Employment
    Lawyers' Association in Support of Appellant

Kathryn H. Levering

Drinker Biddle & Reath
Philadelphia, PA 19107-3496

    Attorney for Amicus Curiae
    Lockheed Martin Corp. in Support of Appellees
                    OPINION OF THE COURT


SLOVITER, Chief Judge.


        This appeal offers the en banc court the opportunity to
attempt to clarify the quantum and nature of evidence that will
permit a jury to find that an employer engaged in impermissible
employment discrimination.  Although we believe that several of
our opinions in recent years accurately and adequately set forth
the applicable legal principles, the decision of the district
court and that of a panel of this court, now withdrawn, require
us to return to the central issue presented here.
                                I.
        Barbara Sheridan, a former employee of E.I. DuPont de
Nemours & Co. (DuPont), filed this action under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq., charging
DuPont and her former supervisor, Jacques Amblard, with several
claims of sex discrimination and retaliation.  Sheridan, who had
been an employee of the Hotel du Pont since 1979 and was at the
time her employment ceased one of the Head Captains of the
hotel's Green Room, asserted that DuPont discriminated against
her on the basis of her sex when it failed to promote her to
Manager of Restaurants in 1991 (Count I), retaliated against her
for complaining about sex discrimination by putting her on
probation and taking various disciplinary actions against her
(Count II), and created intolerable working conditions,
culminating in her removal from a supervisory position, which
resulted in her constructive discharge (Count III).
        After discovery, the defendants moved for summary
judgment which the district court denied.  The court held that
Sheridan had presented a prima facie case of discrimination and
sufficient evidence to permit a factfinder to believe that
DuPont's reasons for not promoting her, i.e., that she was not
qualified for the position of Manager of Restaurants and that she
had not applied for the position, were pretexts for
discrimination.  App. at 57.  The court further held that
Sheridan had presented adequate evidence to survive summary
judgment on her retaliation claim and to enable a factfinder to
reasonably believe that her supervisors had intentionally
fabricated evidence of poor job performance in order to remove
her from her position as Head Captain and offer her less
desirable, dead-end jobs.  App. at 68.  The court concluded that
"[i]f plaintiff's version of the facts were accepted by a trier
of fact, it would be reasonable for the trier of fact to conclude
that resignation was plaintiff's only option."  Id.
        Thereafter, the case proceeded to trial. The conduct
that was the subject of Sheridan's claims straddled the period

before and after November 21, 1991, the date of the enactment of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991), which granted a right to a jury trial on Title VII intentional discrimination claims for which compensatory or punitive damages are sought, id. § 1977A(c), 105 Stat. at 1073 (codified at 42 U.S.C. § 1981a(c)).  The district court ruled that the jury would serve as the finder of fact for Sheridan's claims that were based on conduct that occurred after that date, but that the jury would serve only in an advisory capacity for claims based on events that occurred before that date.  This meant that the jury's verdicts on Count I (failure to promote) and the alleged retaliatory acts in Count II that occurred before November 21, 1991 were to be advisory, while the jury was to be the finder of fact for the remaining alleged acts of retaliation and with respect to Count III, Sheridan's claim of constructive discharge.

The trial occupied six days.  During the trial, the district court dismissed the claims against Amblard on the ground that an employee cannot be sued under Title VII.

After deliberating, the jury returned special interrogatories.  With respect to the promotion claim, the jury found that Sheridan was not qualified for the job of Manager of Restaurants and therefore found against her on her claim of discriminatory failure to promote.  With respect to retaliation, the jury found that DuPont had not retaliated against Sheridan for complaining of sex discrimination.  In contrast, the jury did find in Sheridan's favor on her claim of constructive discharge. It awarded her $17,500 in compensatory damages, over and above lost wages, but found that DuPont's actions were not taken "with malice or reckless indifference" to her rights, App. at 33, thus precluding Sheridan from receiving punitive damages.  See 42 U.S.C. § 1981a (b) (1).  Finally, the jury found that Sheridan had failed to mitigate her damages by $33,000, that amount to be deducted from the total amount of lost wages owed.  Because the court calculated Sheridan's lost wages to be $51,072, it awarded her $18,072, in addition to six months of front pay totalling $12,768.  The district court adopted as its own the jury's findings with respect to the conduct alleged in Counts I and II that took place before November 21, 1991.

Both parties moved for judgment as a matter of law or in the alternative for a new trial.  The district court granted judgment in DuPont's favor.  The court recognized that DuPont had proffered as one of the principal reasons for the disciplinary actions it had taken against Sheridan her alleged unauthorized "comping," i.e., giving away complimentary food and drinks in violation of the hotel's policy that they should be registered, and Sheridan offered evidence to the contrary, indeed, evidence that she was elsewhere on some of the days that DuPont claimed she was engaged in "comping" at the hotel.

In overturning the jury's verdict on the constructive discharge claim in favor of Sheridan, the court stated that even if the jury could have reasonably rejected the legitimacy of DuPont's investigation of Sheridan's alleged "comping," and thus its reasons for discharging her, "the Court is still left

searching the record for evidence that gender played a determinative role in defendant's conduct. . . . The Court . . . has failed to locate sufficient evidence from which the jury could infer such a finding." Sheridan v. E.I. DuPont de Nemours and Co., No. 93-46 (D. Del. July 14, 1994) at 9. The court ruled that the evidence Sheridan presented which arguably related to her gender, such as the facts that no woman had ever held the position of Manager of Restaurants, that a man replaced Sheridan as Head Captain of the Green Room morning shift, that Amblard had told Sheridan he would watch her like a "hawk" and a "dog," and Amblard's actions in ignoring her and speaking instead to one of her male supervisors if one was present, was even in totality insufficient to support a reasonable inference that gender was a motivating factor in DuPont's actions. Id. at 9-10.

The court stated that "[i]n order to demonstrate that gender was a motivating factor, plaintiff would have to point to some evidence that was the motive of those in the decision making process. No such evidence exists in the record." Id. at 11-12. The district court accordingly granted DuPont's motion for judgment as a matter of law, and ruled conditionally, pursuant to Fed. R. Civ. P. 50(c), that if the judgment were reversed on appeal, DuPont would be entitled to a new trial "because the jury's verdict is contrary to the weight of the evidence." Id. at 12 n.11. Sheridan appealed.

A panel of this court heard argument on May 4, 1995 and issued an opinion that reversed the district court's order granting judgment as a matter of law for DuPont on Sheridan's constructive discharge claim but was divided as to the alternative grant of a new trial, with two judges voting to affirm the grant of a new trial and the third voting to remand the issue whether a new trial was warranted for reconsideration by the district court, using the correct legal principles. SeeSheridan v. DuPont, No. 94-7509 (Jan. 31, 1996), vacated, 74 F.3d 1439 (3d Cir. 1996). The majority and dissenting opinions differed in particular in their interpretation of the effect of the Supreme Court's opinion in St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), on the inferences that the finder of fact may draw from its disbelief of the employer's proffered justification for the disciplinary employment action taken against Sheridan and the amount and type of evidence needed to sustain a jury verdict.

Both DuPont and Sheridan petitioned for rehearing and the court voted to hear the appeal en banc. As required by our Internal Operating Procedures, the opinion of the panel issued January 31, 1996 was withdrawn and the court held the en banc argument on May 14, 1996.

II.
DISCUSSION
A.
Legal Issues

The parties disagree both as to the applicable law and the weight of the evidence. DuPont argues that the district court's decision in its favor should have been affirmed in all respects. It apparently recognizes that the district court's

finding that Sheridan had not carried her burden of proving that DuPont's decisions were based on gender discrimination was not consistent with this court's prior decisions. Thus, DuPont challenges and requests that we reconsider our prior decisions with respect to the "recurring problem of the shifting burdens" in employment discrimination cases, arguing that our decisions do not fully incorporate the teaching of the Supreme Court in Hicks. It singles out in particular the "underlying decision of the Court in [Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)]." DuPont's Petition for Rehearing at 5.

Sheridan for her part argues that we have correctly interpreted Hicks in our post-Hicks decisions with respect to the evidence that would permit a plaintiff claiming employment discrimination to prevail, and cites, inter alia, Fuentes, 32 F.3d 759; Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir.), cert. denied, 115 S.Ct. 2611 (1995); Waldron v. SL Industries, 56 F.3d 491 (3d Cir. 1995); and Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326 (3d Cir. 1995).

We thus turn, this time en banc, to reexamine what DuPont calls "this continuing and perplexing problem of interpreting the shifting burden of Hicks."

By the time Hicks reached the Supreme Court, the required components of a plaintiff's prima facie case of employment discrimination had been established in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 & n.6 (1981), as had been the requirement that the employer was obliged to proffer a nondiscriminatory reason for its adverse employment action, see McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254. Also established was the requirement that the burden of persuasion remained at all times with the plaintiff. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983); Burdine, 450 U.S. at 256. Still open, however, and the subject of considerable dispute, was the effect of the decision by the trier of fact that the reasons given by the employer were not the real reasons for the adverse employment action. As the Court noted in Hicks, there were cases in the courts of appeals that held that a finding of pretext does not mandate a finding of illegal discrimination, see, e.g., EEOC v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir. 1992); Galbraith v. Northern Telecom, Inc., 944 F.2d 275, 283 (6th Cir. 1991), cert. denied, 503 U.S. 945 (1992), and others that held that a finding of illegal discrimination was mandated on a finding of pretext, see, e.g., Hicks v. St. Mary's Honor Center, 970 F.2d 487, 492-93 (8th Cir. 1992), reversed, 509 U.S. 502 (1993); King v. Palmer, 778 F.2d 878, 879 (D.C.Cir. 1985); Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395-96 (3d Cir.), cert. denied, 469 U.S. 1087 (1984).

In Hicks, a case in which the plaintiff had brought a Title VII action alleging that he was demoted and discharged because of his race, the court of appeals had concluded that "[o]nce plaintiff proved all of [the employer's] proffered reasons for the adverse employment actions to be pretextual, plaintiff was entitled to judgment as a matter of law." 970 F.2d

at 492. It was this holding that was reversed by the Supreme Court, which held that judgment for the plaintiff is not compelled by the disbelief of the employer's reasons. 509 U.S. at 511. On the other hand, the Court also explicitly stated that a finding that the reasons proffered are pretextual permits the factfinder to draw the inference that the defendant intentionally discriminated against the plaintiff. Id.

In deciding the "ultimate question" of whether the employer unlawfully discriminated, the Court stated in the following oft-quoted passage that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Id. The Court explained that "rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination," and continued: "the Court of Appeals was correct when it noted that, upon such rejection, '[n]o additional proof of discrimination is required.'" Id. (emphasis in original) (quoting Hicks, 970 F.2d at 493).

Reading these statements in the context of the Court's opinion, we have understood Hicks to hold that the elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings, beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination. Accordingly, in Fuentes we explained that "the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons." 32 F.3d at 764. It followed that a plaintiff may survive summary judgment (or in this case judgment as a matter of law) if the plaintiff produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action. Id. ("[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.").

Although we ultimately decided in Fuentes that the plaintiff had failed to submit evidence which cast sufficient doubt on his employer's proffered reasons for failure to place him in the position that he sought, application of the same approach in some later cases led us to hold that the plaintiff had satisfied his or her burden and raised an issue to be decided by the trier of fact. Thus, in Sempier we reversed the district court's grant of summary judgment for the employer in an Age Discrimination in Employment Act (ADEA) action because Sempier, an executive at an insurance brokerage and consulting firm, had

presented sufficient evidence to create a genuine issue of fact as to whether the company's claim that he was forced to retire for poor performance was a pretext for age discrimination. 45 F.3d at 732-33.

Shortly thereafter, in Waldron, another ADEA case, we again held that summary judgment for the employer was improper because the evidence raised a factual question as to whether the employer's proffered explanations -- that it had discharged the 63-year-old plaintiff due to a company reorganization plan and dissatisfaction with his work performance -- was an attempt to conceal age discrimination. Waldron, 56 F.3d at 502-03. We viewed the district court's holding as requiring plaintiffs to bear the burden of demonstrating "pretext-plus," a burden we had explicitly rejected in Fuentes. Id. at 495.

In Brewer, we again cited Fuentes for the proposition that a plaintiff will survive summary judgment if s/he can produce sufficient evidence that the employer's proffered nondiscriminatory reason for its employment action was not the true reason. 72 F.3d at 331. Finding the evidence in Brewer's case sufficient to permit a jury to believe that the employer's claim of poor performance by the 53-year-old salesman was pretextual, we reversed the district court's entry of summary judgment on Brewer's ADEA claim. Id.

The majority of other federal courts of appeals appear to have interpreted Hicks in a similar manner to this court's precedent. See, e.g., Shaw v. HCA Health Servs. of Midwest, Inc., 79 F.3d 99, 100 (8th Cir. 1996) (where defendant did not dispute that plaintiff made out a prima facie case and there was evidence that defendant had altered performance evaluations of plaintiff after firing him, "jury was entitled (although not required) to conclude . . . that the reasons given by the hospital for firing [plaintiff] were a pretext for age discrimination"); Barbour v. Merrill, 48 F.3d 1270, 1277 (D.C. Cir. 1995) ("As Hicks explained, a factfinder's rejection of the employer's nondiscriminatory reasons, while not sufficient to compel a finding of discrimination, nonetheless suffices to permit such a finding."), cert. dismissed, 116 S. Ct. 1037 (1996); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) ("A finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994) ("Hicks clarified that the only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination based upon the plaintiff's prima facie case from a mandatory one which the jury must draw, to a permissive one the jury may draw, provided that the jury finds the employer's explanation `unworthy' of belief."); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994) (to defeat summary judgment, Title VII plaintiff "must only `produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for his dismissal" (citation omitted)); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) (plaintiff can defeat summary judgment by

"present[ing] evidence sufficient to establish a prima facie case, and . . . show[ing] that there is a genuine dispute of material fact about [the defendant's] proffered explanation" for its action); Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir. 1993) ("[A]s St. Mary's recognizes, the factfinder in a Title VII case is entitled to infer discrimination from plaintiff's proof of a prima facie case and showing of pretext without anything more . . . .").

The Equal Employment Opportunity Commission, the government agency charged with enforcement of the employment discrimination laws and an amicus curiae in this case, has also taken the view "that a prima facie case, coupled with a non-credible justification from the employer, is sufficient to support a finding of discrimination."  EEOC Enforcement Guidance on St. Mary's Honor Center v. Hicks, EEOC Comp. Man. (BNA), N:3361, 3363 n.3 (Apr. 12, 1994).  "As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986)(internal quotation marks and citations omitted).

The attack by DuPont and the dissent on the paradigm we and these other courts have constructed in the wake of Hicks is multi-faceted.  DuPont suggests that there is an inconsistency between this court's caselaw, as applied or articulated, and the requirement that the ultimate burden of persuasion of intentional discrimination must rest with the plaintiff.  We find no such inconsistency.  More important, the Supreme Court itself in Hicksexpressly stated that its various statements in that opinion as to the burden that plaintiff must bear, i.e. "it is not enough . . . to disbelieve the employer," 509 U.S. at 519, and the plaintiff must show "both that the reason was false, and that discrimination was the real reason," id. at 515, were not inconsistent with the statement in the opinion that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination," id. at 511.  Hicks explained that the statement that "rejection of the defendant's proffered reasons is enough at law to sustain a finding of discrimination" was not inconsistent with its placement of the burden of persuasion on the plaintiff because "there must be a finding of discrimination."  Id. at 511 n.4 (emphasis throughout discussion in original).  Thus, the Supreme Court has answered the very claim of inconsistency DuPont purports to find in our interpretation of Hicks.

Similarly unpersuasive is the dissent's suggestion that Fuentes impermissibly gives continuing weight to the presumption of discrimination created by the prima facie case even after the McDonnell Douglas presumption has dissipated or "burst."  This argument is based on the mistaken assumption that once the presumption of discrimination created initially by the prima facie case "drops from the case," Burdine, 450 U.S. at 255 n.10, the underlying facts lose their probative value.  However, the Supreme Court specifically explained in Burdine that "[i]n saying

that the presumption [of discrimination] drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. . . .  [T]his evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual."  Id. As long as the jury must make a finding of intentional discrimination, there is no reason why the evidence that supported the prima facie case coupled with the jury's determination that the employer's proffered explanations are pretextual is not sufficient to support a verdict of discrimination.

As Chief Justice, then Justice, Rehnquist earlier had explained, the initial presumption of discrimination arises from the plaintiff's prima facie case of discrimination "because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978). He continued:

> [W]e are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

Id.

This court has previously noted the probative significance of the factfinder's disbelief in a proffered explanation by a party, stating:

> It has always been understood -- the inference indeed is one of the simplest in human experience -- that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.

McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921-22 (3d Cir. 1985) (quoting 2 Wigmore § 278(2) (Chadbourne Rev. 1979)).  As another court recently remarked in the context of an employment discrimination case:  "Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."  Binder v. Long Island Lighting Co., 57 F.3d 193, 200

(2d Cir. 1995).

We presume that the same logic, albeit unarticulated, was the basis for the Supreme Court's statement in Hicks that disbelief of the employer's reason will permit the factfinder to infer the ultimate fact of discrimination, 509 U.S. at 511, even though the presumption of discrimination "drops from the case" after the employer proffers a legitimate reason for its actions, Burdine, 450 U.S. at 255 n.10.

We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful discrimination. If the employer fails to come forth with the true and credible explanation and instead keeps a hidden agenda, it does so at its own peril. Under those circumstances, there is no policy to be served by refusing to permit the jury to infer that the real motivation is the one that the plaintiff has charged.

The dissent concedes that in the usual case after the presumption created by the prima facie case has dissipated and sufficient evidence of pretext has been adduced, there will be sufficient evidence to support a verdict of discrimination. The dissent is concerned that in the atypical case this may not be so. It posits the situation of a plaintiff who claims multiple grounds, all illegal, for the employment action. We see no reason to engage in a dialogue of speculation as to how to treat such a case, divorced from a factual record, particularly because the situation presented by the dissent was not the case in Hicks, where the plaintiff claimed race discrimination, was not the case in Fuentes, where the plaintiff claimed national origin discrimination, nor is it the case before us now, where Sheridan claims only sex discrimination.

The other situation posited by the dissent for its unwillingness to join the otherwise unanimous en banc court is that created where an employer "may not wish to disclose his real reasons for not promoting B over A." Dissenting Typescript Op. at 22 n.8. The persistence in maintaining that the employment action was taken because the plaintiff was unqualified or the position was being eliminated due to a reduction in force when the employer knows that the real reason is nepotism would violate the spirit if not the language of Rule 11 of the Federal Rules of Civil Procedure. The dissent gives no reason why a plaintiff alleging discrimination is not entitled to the real reason for the personnel decision, no matter how uncomfortable the truth may be to the employer. Surely, the judicial system has little to gain by the dissent's approach.

The Supreme Court has stated that an employer can meet its burden of articulating the reason for its action only through the introduction of admissible evidence. Burdine, 450 U.S. at 255 n.9. Burden-shifting is designed "to sharpen the inquiry into the elusive factual question of intentional discrimination." Id. at 255 n.8. It follows that the Burdine analysis is rooted in the requirement that when the employer advances through admissible evidence the reasons for its actions, those must be its legitimate reasons.

The dissent argues that mere disbelief of the

employer's articulated reason is not enough to sustain a verdict. Of course Hicks did not rely merely on the factfinder's disbelief of the explanation proffered by the employer to uphold a verdict for the employee. Instead, as we have noted, under Hicks it is the combination of the disbelief in the employer's proffered explanation, the evidence that supported finding a prima facie case, and the jury's finding of intentional discrimination following a proper instruction to that effect.

Although the dissent states at the outset that its approach "does not mean that a plaintiff, in order to reach the trier of fact, must always prove 'pretext plus,' i.e., that the plaintiff must always produce some evidence in addition to what is necessary to establish a prima facie case and to show that the employer's explanation is pretextual," Dissenting Typescript Op. at 2 (emphasis added), the dissent's approach would bring the courts of this circuit back to the confusion and uncertainty created by the "pretext plus" and "some evidence" language that prompted this court to consider this case en banc.

In Sheridan's case, the district court had reviewed the evidence presented in connection with DuPont's motion for summary judgment and found that Sheridan had made out a prima facie case for gender discrimination culminating in constructive discharge.

Also, the district court had carefully instructed the jury on the need to find intentional discrimination before it could return a verdict for Sheridan on any of her claims. Early in its charge the court had advised the jury that this case involves "allegations of intentional sexual discrimination, that is, of intentionally treating some people less favorably than others because of their gender." App. at 111. Again, in connection with the constructive discharge count the court had reminded the jury that Sheridan must prove "by a preponderance of the evidence that 1) defendant intentionally made plaintiff's working conditions so intolerable that a reasonable person would feel forced to resign; 2) plaintiff's gender was the sole motivating factor in the defendant's conduct; and 3) plaintiff, in fact, resigned." App. at 123. The jury's verdict signifies that it rejected DuPont's proffered reasons for its employment action and believed that the real reason was discrimination.

In granting judgment as a matter of law for DuPont, the district court stated that "plaintiff would have to point to some evidence" that gender was the motive of those in the decision making process. It is evident that the district court believed that something more was required than was set forth in Hicks and our cases. Not only was such a requirement of additional evidence rejected in Fuentes where we stated that "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case," 32 F.3d at 764, but it is also inconsistent with the statement in Hicks that upon rejection of the defendants' proffered reasons for the action, "no additional proof of discrimination is required." 509 U.S. at 511 (internal quotation marks omitted).

As the Supreme Court has noted, "[t]here will seldom be

`eyewitness' testimony as to the employer's mental processes."
United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S.
711, 716 (1983).  We have recognized that "[d]iscrimination
victims often come to the legal process without witnesses and
with little direct evidence indicating the precise nature of the
wrongs they have suffered."  Jackson v. University of Pittsburgh,
826 F.2d 230, 236 (3d Cir. 1987), cert. denied, 484 U.S. 1020
(1988).  Cases charging discrimination are uniquely difficult to
prove and often depend upon circumstantial evidence.  See, e.g.,
Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081-82 (3d
Cir. 1996); Lockhart v. Westinghouse Credit Corp., 879 F.2d 43,
48 (3d Cir. 1989); Chipollini v. Spencer Gifts, Inc., 814 F.2d
893, 897 (3d Cir.) (en banc) cert. dismissed, 483 U.S. 1052
(1987); Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984).
"This is true in part because . . . discrimination . . . is often
subtle."  Chipollini, 814 F.2d at 899.  "[A]n employer who
knowingly discriminates . . . may leave no written records
revealing the forbidden motive and may communicate it orally to
no one."  Id. (quoting LaMontagne v. American Convenience Prods.,
750 F.2d 1405, 1410 (7th Cir. 1984)).

The distinct method of proof in employment
discrimination cases, relying on presumptions and shifting
burdens of articulation and production, arose out of the Supreme
Court's recognition that direct evidence of an employer's
motivation will often be unavailable or difficult to acquire.
See Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989)
(O'Connor, J., concurring) ("[T]he entire purpose of the
McDonnell Douglas prima facie case is to compensate for the fact
that direct evidence of intentional discrimination is hard to
come by."); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111,
121 (1985) ("The shifting burdens of proof set forth in McDonnell
Douglas are designed to assure that the plaintiff has his day in
court despite the unavailability of direct evidence." (internal
quotation marks omitted)); see also International Bhd. of
Teamsters v. United States, 431 U.S. 324, 359 n.45 (1977)
(recognizing that burden-shifting rules "are often created . . .
to conform with a party's superior access to the proof");
Chipollini, 814 F.2d at 897; Dillon, 746 F.2d at 1003.

Thus, it is not only disbelief in the employer's
proffered reason that would suffice to sustain the plaintiff's
case, as the dissent argues.  It is the jury's determination that
the reason given was pretextual together with the evidence that
supported the prima facie case that will sustain a finding of
intentional discrimination made after a proper charge.

The role of determining whether the inference of
discrimination is warranted must remain within the province of
the jury, because a finding of discrimination is at bottom a
determination of intent.  In making that finding, the jury must
perform its traditional function of assessing the weight of the
evidence, the credibility of the witnesses through observation of
both direct testimony and cross-examination at trial, and the
strength of the inferences that can be drawn from the elements of
the prima facie case and the evidence that undermines the
employer's proffered reasons for its actions.  This is uniquely

the role of the factfinder, not the court. See Barber v. CSX Distribution Servs., 68 F.3d 694, 700 (3d Cir. 1995)("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it." (quoting Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 262 (3d Cir. 1987), cert. denied, 488 U.S. 1004 (1989))); see also Aikens, 460 U.S. at 716 ("It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." (quoting Edgington v. Fitzmaurice, 29 Ch. Div. 459, 483 (1885)); Chipollini, 814 F.2d at 899 ("The issue of the defendant's intent at the time of the plaintiff's discharge is clearly a factual question.").

This does not mean that the courts in discrimination cases lose their traditional obligation, when faced with a motion for judgment as a matter of law, to review the adequacy of the showing presented to the factfinder. The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible, and our previous cases have explained in detail the plaintiff's burden in this regard. See, e.g., Fuentes, 32 F.3d at 764-65 ("[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them `unworthy of credence . . . .'" (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), cert. denied, 510 U.S. 826 (1993))). But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer.

With these legal principles before us, we turn to the district court's order granting judgment for DuPont as a matter of law on Sheridan's jury verdict that she was constructively discharged as a result of discrimination. We exercise plenary review of the district court's order granting DuPont's motion for judgment as a matter of law. Seman v. Coplay Cement Co., 26 F.3d 428, 431 (3d Cir. 1994).

B.
Factual Issues

We need not recount all of the evidence adduced at the trial because we examine the record with the limited purpose of ascertaining whether there was sufficient evidence to withstand judgment as a matter of law. In doing so, we must look at the evidence in the light most favorable to Sheridan, the verdict winner, and draw all reasonable inferences in her favor. SeeHofkin v. Provident Life & Accident Ins. Co., 81 F.3d 365, 369 (3d Cir. 1996).

At the time of the events that formed the basis of this case, Sheridan was one of five head captains at the hotel, occupying the position of Head Captain of the Green Room for the breakfast and lunch shifts. Sheridan, who began working at the

hotel as a part-time waitress in 1979, reached that supervisory position in 1989 following a series of steady promotions. In addition to those promotions, Sheridan had received numerous commendations for her job performance.

Focusing on the period immediately before that at issue, there was evidence that in May 1989 Sheridan was nominated by her peers and received an "Employee of the Quarter Award" for "outstanding" work. She received merit raises in May 1990 and February 1991. In July 1990 she received a "Way to Go" award from the Personnel & Administrative Services Division for "going beyond the call of duty." DuPont's October 29, 1990 performance review, signed by two supervisors including defendant Jacques Amblard, rated Sheridan overall "very good," the second highest rating. She was rated "outstanding" for "Interpersonal Relationships," "Planning/Organizing," and "Problem-Solving." Although that report noted that "[a]s a team player, strengthening is needed to improve the overall relationship with the rest of the operation," the report listed one of her strengths as "[v]ery good guest relations, organized." The report stated that "Barbara's persistence has paid off by guest loyalty, staff does not call off sick, and overall very good morale from the support team." Even Sheridan's lowest mark, given for "Attendance/Punctuality/Dependability," was "Satisfactory." App. at 197-98.

In December 1990, Sheridan won a $1,000 accomplishment award. The letter informing her of the award referred to her as "a role model" and "a true ambassador for the company." App. at 151. Other restaurant employees received awards ranging from $200-$500, but Sheridan was the only employee to receive an award as high as $1000. App. at 287. In January 1991, Sheridan was chosen as one of about 20 DuPont employees to appear in a company video. App. at 734. On October 1, 1991, Sheridan received a promotion and salary increase.

DuPont attempted to paint a different picture to the jury. Notwithstanding the record evidence of promotions and commendations, it contended that Sheridan's performance began to deteriorate in early 1991. DuPont produced evidence that supervisors met with Sheridan, expressed dissatisfactions, and directed her to improve in various categories. For example, in February 1991, Ed Barba, then the Green Room's Manager, listed "corrective measures" that Sheridan should take, including "maintaining an accurate cover count sheet" to insure that "covers" (customers) were distributed fairly among the staff, following the "grooming policy" which required that she report to work on time and in full dress, and refraining from using the Green Room as a break room and for smoking. App. at 228. Nicholas Waller testified that in the summer of 1991, as Manager of Restaurants, he met with Sheridan to discuss alleged complaints that Sheridan had asked Green Room employees to help her with personal tasks, such as parking her car, giving her a wake-up call, or taking her personal mail to the post office, and that she had rewarded employees who complied by giving them additional "covers" in the dining room. App. at 960-63.

On October 17, 1991, Jeff Maisel, by then the Manager

of Restaurants, met with Sheridan to discuss problems allegedly perceived with her performance, including tardiness and continuing disregard for the hotel's grooming policy. App. at 206, 885. On November 10, 1991, Maisel placed Sheridan on probation, ostensibly on the ground that she had not corrected her performance. Maisel warned Sheridan that her failure to follow the hotel's policies could result in her termination. App. at 208.

In support of its claim of Sheridan's inadequate performance, DuPont introduced various notes and records that DuPont had compiled of specific infractions by Sheridan. Illustrative of DuPont's complaints is a memo by Barba to the file that on one occasion he had observed Sheridan smoking in the Green Room Bar and putting on makeup. A report meticulously listed other details to support placing Sheridan on probation. DuPont contended that even while Sheridan was on probation, she continued her inadequate performance.

An important part of DuPont's defense for its employment actions centered on its claim that Sheridan had engaged in "comping," i.e., giving away complimentary food and drinks without ringing up complimentary checks. The hotel began investigating Sheridan for this activity in late February, 1992, and its record of the investigation lists statements of numerous co-workers. App. at 222-26. James Dougherty, a bartender who was one of DuPont's principal witnesses on "comping," reported to DuPont that due to his concerns about numerous "discrepancies" and "cash handling problems" with Sheridan, he began to keep track of the amount of free liquor Sheridan gave away. He recorded that it totaled $921.75 from November 1, 1991 to February 18, 1992, with $417.25 worth of drinks given away in December alone. App. at 222. Dougherty testified at trial that each time he saw Sheridan serve a free drink, he would record the date and dollar amount of the drink, and claimed that his dates were about "98-percent accurate." App. at 688.

Maisel testified that based on the hotel's internal investigation, DuPont decided that Sheridan should be reassigned to a non-supervisory position that would not require her to handle cash. App. at 910. Sheridan was offered three options: front desk receptionist, banquet server, or health club attendant, with no diminution of salary. The hotel claimed that she would be eligible for advancement in any of those positions, although Sheridan offered evidence at trial that suggested otherwise. See App. at 473-75, 776. After considering the offer for some weeks, Sheridan resigned.

Sheridan's testimony at trial portrayed the events differently than did DuPont. It was her position that the alleged dissatisfaction with her performance stemmed from her complaint of sex discrimination which she made in the fall of 1991, when the hotel reorganized its structure to eliminate the individual restaurant managers and to place a new manager over all of the restaurants in the hotel. The hotel did not advertise the position, considered only five of its own employees for the new post (all men), and selected Maisel. DuPont did not consider Sheridan for the position, id., and Sheridan complained to

Amblard at least three times in the period of September and October 1991 that she was not promoted due to gender discrimination. App. at 51–52. She also testified that around this time, Amblard told her repeatedly that he planned to watch her "like a dog" and "like a hawk." App. at 748. Sheridan's position was that the hotel's recordkeeping of details of her daily activity was "nitpicking" in retaliation for her complaints of sex discrimination. App. at 1337. She further sought to portray Amblard as a sexist and testified that, when she was with one of the other male supervisors, he would ignore her and instead speak only to the man. App. at 748.

In addition to the affirmative evidence of her own accomplishments, Sheridan presented evidence at trial that was directed to impeaching the credibility of DuPont's witnesses, particularly, but not limited to, Dougherty and Maisel. Sheridan demonstrated that for two weeks in January 1992, during which Dougherty listed three dates when she allegedly dispensed free drinks, she had reported for jury duty at the Superior Court. App. at 173–79, 540–43. Even a document handwritten by Maisel showed that another head captain was scheduled to cover Sheridan's shift on those days. App. at 167. Maisel's schedule also indicated that Sheridan was not scheduled for work on December 23 and 24, 1991, although Dougherty's list included these dates among those when Sheridan allegedly required him to deliver complimentary drinks. App. at 167, 227, 540. In fact, Maisel's written work schedule could be viewed as contradicting Dougherty's list as to seven separate dates.

In seeking to show the pretextual nature of DuPont's articulated reasons, Sheridan noted, inter alia, the temporal proximity of her complaints to Amblard of sex discrimination and his statements that he would watch her like a "hawk" to the subsequent surfacing of dissatisfaction with her performance, the meticulous recordkeeping of the details of her daily activities, and the hotel's investigations into her alleged "comping."

Thus, it is clear that the jury in this case was faced with evidence on both sides of the issues raised by the parties. The jury's verdict for Sheridan on her constructive discharge claim shows that the jury accepted Sheridan's view on this claim and rejected DuPont's explanation as pretextual.

We have previously cautioned that "[i]n determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). A reasonable jury could have disbelieved DuPont's proffered reasons for its actions based on Sheridan's evidence and its rejection of the credibility of certain of DuPont's principal witnesses, such as Dougherty and Maisel. We find no paucity of evidence on which the jury could have based its finding for Sheridan on her constructive discharge claim.

Under the applicable law, a plaintiff who voluntarily resigned may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. See Gray v.

York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992). We apply an objective test to determine whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).

In denying DuPont's motion for summary judgment, the district court rejected DuPont's argument that there was no basis on which a jury could find that the conditions to which Sheridan claimed she was subjected could have reached the level that would constitute a constructive discharge. Instead, the court held that if Sheridan's version of the facts were accepted by a trier of fact, it would be reasonable for the trier of fact to conclude that resignation was Sheridan's only option. Thus, when the court instructed the jury, it charged that for the jury to find that DuPont constructively discharged Sheridan, she must have proved by a preponderance of the evidence that DuPont "intentionally made [her] working conditions so intolerable that a reasonable person would feel forced to resign" and that "[Sheridan's] gender was the sole motivating factor in the defendant's conduct." App. at 1487.

The evidence of the series of investigative activities, allegations of improprieties, placement on probation after more than a decade of satisfactory performance, and the ultimate removal of Sheridan from her supervisory position in the highly reputed Green Room to one of three far less prestigious dead-end positions, such as the health club attendant, could have been viewed by the jury as meeting the criteria of a constructive discharge. The jury returned an unqualified verdict finding that DuPont had constructively discharged Sheridan and did so based on her gender. We cannot hold that Sheridan failed to present sufficient evidence to withstand DuPont's motion for judgment as a matter of law, and therefore will reverse the district court's order to that effect.

## C.
### Grant of a New Trial

Because the district court's ruling focused primarily on its decision to grant DuPont's motion for judgment as a matter of law, the court's explanation for its grant of a new trial was brief. The court noted in a footnote that it was obliged under Fed.R.Civ.P. 50(c) to make a conditional ruling on the defendant's motion for a new trial. To comply with that requirement, the court stated merely that it "would grant the motion for a new trial because the jury's verdict is contrary to the weight of the evidence." Sheridan (July 14, 1994) at 12 n.11.

We are unable to ascertain the extent to which this ruling was affected by the court's misconception that direct evidence of discriminatory intent was necessary to sustain the jury's verdict, i.e., its understanding that "[i]n order to demonstrate that gender was a motivating factor, plaintiff would have to point to some evidence that that was the motive of those in the decision-making process." D. Ct. Opinion at 11-12.

Because such evidence is not a prerequisite to a finding of intentional discrimination, we believe the district court should reconsider whether a new trial is warranted in light of the correct legal principles.

It is also unclear whether the district court applied the complete test for ruling on a new trial motion. In granting that motion, the district court merely concluded that the jury's verdict was contrary to the weight of the evidence. Although we recognize that a new trial may be granted even if the evidence is legally sufficient to support the verdict, Roebuck v. Drexel Univ., 852 F.2d 715, 735-36 (3d Cir. 1988), we have nonetheless cautioned that a district court should grant a new trial on the basis that the verdict was contrary to the weight of the evidence "only where a miscarriage of justice would result if the verdict were to stand," Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991). We have explained that this stringent standard is necessary "to ensure that a district court does not substitute its `judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts.'" Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992) (quoting Lind v. Schenley Indus. Inc., 278 F.2d 79, 90 (3d Cir.) (en banc), cert denied, 364 U.S. 835 (1960)), cert. denied, 507 U.S. 921 (1993).

Therefore, before imposing on Sheridan the burden and expense of a new trial, we will remand to require the district court to determine whether, inasmuch as Sheridan was not obliged to produce direct evidence of discriminatory intent, the jury's verdict for Sheridan was against the great weight of the evidence and would effect a miscarriage of justice.

We have previously remarked that the district court's instruction to the jury placed on Sheridan a higher burden of proof than our cases require. See note 2, supra. If there were a new trial, Sheridan would not have to prove that discrimination was the sole cause of DuPont's action but only that discrimination was a motivating factor in its decision. SeeMiller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995) (en banc).

Sheridan has raised other trial errors to support her motion for a new trial, but we need consider briefly only one. Sheridan argues that the district court erred in excluding testimony of a female co-worker that Amblard stated, after watching a woman in a tight dress walk by, that he "would like to grab that," App. at 699-700, 1520, and that on another occasion Amblard rejected her offer to park cars at the hotel on the ground that she could not park cars because she was a woman. App. at 1521. The district court excluded this testimony under Federal Rules of Evidence 401 and 403, finding these statements "prejudicial and irrelevant." App. at 44. We review a district court's rulings concerning the admission of evidence for abuse of discretion. Glass v. Philadelphia Elec. Co., 34 F.3d 188, 191 (3d Cir. 1994). Although Amblard's comments would be relevant to determining whether he was biased against women generally and

therefore the district court took too narrow a view in holding that they had no probative value, we cannot conclude that the district court abused its discretion in deciding that Amblard's statements were more prejudicial than probative of the ultimate issue of whether DuPont's employment actions as to Sheridan were caused by gender-based animus.  We turn then to the final issue before us, the court's dismissal of Amblard as a defendant.

D.

Individual Liability Under Title VII

Sheridan contends that the district court erred in dismissing Jacques Amblard as a defendant on the ground that individual employees may not be held liable under Title VII.

Title VII provides, in relevant part:

> It shall be an unlawful employment practice
> for an employer--
>
> (1) to fail or refuse to hire or to
> discharge any individual, or otherwise to
> discriminate against any individual with
> respect to his compensation, terms,
> conditions, or privileges of employment,
> because of such individual's race, color,
> religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a) (emphasis added).  The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person."  Id. § 2000e(b).

Sheridan argues that there is no language in the statute excluding individuals, and she looks to the law of agency to support the proposition that agents can be held jointly liable with employers for wrongs resulting from their tortious conduct.  She also contends that we should interpret the 1991 amendments, which added to the remedies provided in Title VII a provision for compensatory and punitive damages, as suggesting that Congress intended to hold individual defendants liable because, unlike equitable remedies such as reinstatement which are uniquely available from an employer, these newly available monetary remedies can be forthcoming from an employee.

These arguments are not without some force.  However, the clear majority of the courts of appeals that have considered this question have held that individual employees cannot be held liable under Title VII.  See Williams v. Banning, 72 F.3d 552 (7th Cir. 1995); Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995); Gary v. Long, 59 F.3d 1391, 1399 (D.C.Cir.), cert. denied, 116 S.Ct. 569 (1995); Grant v. Lone Star Co., 21 F.3d 649 (5th Cir.), cert. denied, 115 S.Ct. 574 (1994); Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 587-88 (9th Cir. 1993), cert. denied, 510 U.S. 1109 (1994).  Others appear to lean in that direction, see, e.g., Lenhardt v. Basic Inst. of Technology, Inc., 55 F.3d 377 (8th Cir. 1995)(interpreting parallel state statute to preclude employee liability); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510-511 & n.1)(4th Cir.)(deciding issue under ADEA as to "personnel decisions of a plainly

delegable character"), cert. denied, 115 S.Ct. 666 (1994), while others have either permitted liability in an employee's official capacity only, see Cross v. Alabama, 49 F.3d 1490, 1504 (11th Cir. 1995); Garcia v. ELF Atochem North America, 28 F.3d 446, 451 n.2 (5th Cir. 1994), or left the issue an "open question," Ball v. Renner, 54 F.3d 664, 668 (10th Cir. 1995).

In our independent examination of this issue, we find most significant the fact that when Congress amended the statute in 1991 to provide a detailed sliding scale of damages ranging from $50,000 for an employer of more than 14 and fewer than 101 employees, to $300,000 for employers with more than 500 employees, 42 U.S.C. § 1981a(b)(3), it made no reference as to the amount of damages, if any, that would be payable by individuals. This strongly suggests that Congress did not contemplate that such damages would be assessed against individuals who are not themselves the employing entity. SeeTomka, 66 F.3d at 1315; Maxwell's, 991 F.2d at 587 n.2; Ascolese v. Southeastern Pa. Transp. Auth., 902 F. Supp. 533, 540 (E.D.Pa. 1995), modified on other grounds, 925 F. Supp. 351 (1996).

Moreover, we note that Congress had previously expressed its concern about the impact of Title VII litigation on small businesses when it excluded businesses with fewer than fifteen employees from the definition of an "employer." It is reasonable to infer that Congress's concern in that regard applies as well to individuals. See Williams, 72 F.3d at 553; Tomka 66 F.3d at 1314 (citing remarks of legislators indicating concern with burdens imposed upon small businesses forced to defend against Title VII suits); Miller, 991 F.2d at 587.

For these reasons, as well as some of the others cited by the other circuits, we are persuaded that Congress did not intend to hold individual employees liable under Title VII.

III.
CONCLUSION

For the foregoing reasons, we will reverse the district court's entry of judgment in DuPont's favor on the constructive discharge claim, and remand to the district court to reconsider DuPont's motion for a new trial.

Sheridan v. E.I. DuPont
No. 94-7509

ALITO, Circuit Judge, concurring in part and dissenting in part.

I join part IID of the opinion of the court. I also agree with the court's disposition of the plaintiff's evidentiary argument. See Maj. Op. 37-38. I dissent, however, from parts IIA - C of the court's opinion.

I.

My primary disagreement with the majority concerns the test for determining whether a defense motion for summary judgment or judgment as a matter of law should be granted in an

employment discrimination case governed by the procedural scheme sanctioned in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Like several other courts of appeals, see Maj. Op. 15–16, the majority here holds that when the plaintiff has made out a prima facie case and has offered enough evidence to support a finding that the explanation was pretextual, a defense motion for summary judgment or judgment as a matter of law must always be denied. However, there is strong contrary authority, which the majority does not acknowledge. The in banc Fifth Circuit, by a vote of 16 to 1, has rejected the majority's position. Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993 (5th Cir. 1996) (in banc). So have the First and Eleventh Circuits. Isenbergh v. Knight–Ridder Newspaper Sales, Inc., 97 F.3d 436, 442–43 (11th Cir. 1996); Woods v. Friction Materials, Inc., 30 F.3d 255, 260–61 n.3

(1st Cir. 1994); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842–43 (1st Cir. 1993), cert. denied, 114 S.Ct. 1398 (1994). I believe that these other courts have analyzed the question more accurately than the majority has here.

If the majority had merely said that, under the circumstances described above, a defense motion for summary judgment or judgment as a matter of law must generally be denied, I would agree. When a plaintiff makes out a prima facie case and there is sufficient evidence in the record to permit a rational trier of fact to find that the employer's explanation is untrue, a defense motion for summary judgment or judgment as a matter of law should usually be denied. But not always, as the majority contends.

In my view, the correct test is the following: a defense motion for summary judgment or judgment as a matter of law should be granted when the evidence in the record could not persuade a rational trier of fact that intentional discrimination on the ground alleged by the plaintiff was a determinative cause of the challenged employment action. This does not mean that a plaintiff, in order to reach the trier of fact, must always prove "pretext plus," i.e., that the plaintiff must always produce some evidence in addition to what is necessary to establish a prima facie case and to show that the employer's explanation is pretextual. On the contrary, in most cases, such additional proof is not needed. But I disagree with the majority that proof of the elements of the prima facie case and proof of pretext are always enough.

II.

A. The key to the question at issue lies in the nature of the "presumption" of discrimination that arises when the plaintiff establishes the elements of a prima facie case. In Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981), the Court explained that the "[e]stablishment of the prima facie case in effect creates a presumption that the employer discriminated against the employee." This presumption "places upon the defendant the burden of producing an explanation to rebut the prima facie case -- i.e., the burden of producing

evidence that the adverse employment actions were taken `for a legitimate nondiscriminatory reason.'"  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993), (quoting Burdine, 450 U.S. at 254).  But while this presumption shifts the burden of production to the defendant, "`[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).  "In this regard," Hicks observed, "it operates like all presumptions, as described in Federal Rule of Evidence 301."  509 U.S. at 507.

Critical for present purposes is what happens when the defendant satisfies its production burden.  Burdine addressed this question in the following passage:

> If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, 10/ and the factual inquiry proceeds to a new level of specificity.

> 10/ See generally J. Thayer, Preliminary Treatise on Evidence 346 (1898).  In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case.  A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence.  Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual . . . .

450 U.S. at 255 & n.10.

Hicks similarly explained that, if the defendant meets its production burden, "the McDonnell Douglas framework -- with its presumptions and burdens -- is no longer relevant" and should not be "resurrect[ed.]"  509 U.S. at 510.  "The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture," and "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him [on the ground alleged.']"  Hicks, 509 U.S. at 510-11 (quoting Burdine, 450 U.S. at 253).

B.  I interpret these passages to mean that the McDonnell Douglas presumption is governed by the "bursting bubble" theory associated with Professor James Bradley Thayer.  See 2 McCormick on Evidence § 344 at 462 (4th ed. 1992).  Under this theory, "the only effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If that evidence is produced by the adversary, the presumption is spent and disappears."  Id.  The case then proceeds "as though there had never been a presumption at all."  1 Weinstein's Evidence ¶300[01] at 300-4 (1996)(footnote omitted).

That Burdine and Hicks regarded the McDonnell Douglaspresumption as governed by this theory is suggested by the following.  First, Burdine states that the term "presumption" properly "`refers only to a device for allocating the production burden,'" 450 U.S. at 254 n.8 (emphasis added) (citation omitted) -- the orthodox "bursting bubble" view.  Second, both Burdine and Hicks employ classic "bursting bubble" language to describe what happens to a presumption if the defendant satisfies its production burden: the presumption then "drops from the case," "drops out of the picture," is "no longer relevant," and should not be "resurrect[ed]."  Third, Burdine's footnote 10, which was quoted above, appears to set out the pure "bursting bubble" theory: once the presumption is burst, all that remains is "the plaintiff's initial evidence" and "inferences properly drawn therefrom."  450 U.S. at 255 n.10.  In addition, this footnote begins with a citation to Thayer, who stated that once the opponent of a presumption offers sufficient counterproof, "[all is then turned into an ordinary question of evidence, and the two or three general facts presupposed in the rule of presumption take their place with the rest, and operate, with their own natural force, as a part of the total mass of probative matter."  James B. Thayer, Preliminary Treatise on Evidence 346 (1898).  Finally, both Burdine and Hicks invoke Federal Rule of Evidence 301, which has generally been interpreted as embodying the "bursting bubble" theory.  See e.g., McKenna v. Pacific Rail Serv., 32 F.3d 820, 829-30 (3d Cir. 1994); id. at 841 (Mansmann, J., dissenting); A.C. Aukerman Co. v. R.L. Chaides Constr., 960 F.2d 1020, 1037-1038 (Fed. Cir. 1992); In re Yoder Co., 758 F.2d 1114, 1120 & n.13 (6th Cir. 1985); Legille v. Dann, 544 F.2d 1, 5-7 (D.C. Cir. 1976); 10 Moore's Federal Practice § 301.04 [4.-1] at III-22 (1995-96 Supp.); 1 Weinstein's Evidence 301-9; 9 Wigmore on Evidence § 2491(2) (3d ed. 1940).

In McKenna, supra, all of the panel members agreed that the McDonnell Douglas presumption and Federal Rule of Evidence 301 embody the "bursting bubble" theory.  Writing for the majority, Judge Lewis concluded that the McDonnell Douglaspresumption is governed by Federal Rule of Evidence 301 and that under this rule "the introduction of evidence to rebut a presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." 32 F.3d at 830.  Judge Lewis then went on to hold that the same rule applies under the New Jersey Law Against Discrimination. Id.  In dissent, Judge Mansmann agreed that the "bursting bubble" theory applies to federal claims, but contended that the New Jersey presumption has a more durable effect.  Specifically, she wrote that "the federal rule `bursts the bubble' of the presumption, while the New Jersey rule creates an issue for the jury."  Id. at 841 (Mansmann, J., dissenting).  With respect to their analysis of federal law, I think that both the McKennamajority and dissent were right.

C.  The version of Rule 301 that was proposed by the Advisory Committee and promulgated by the Supreme Court rejected the "bursting bubble" theory in favor of the theory advocated by

Professor Edmund M. Morgan and others.  Proposed Rule of
Evidence 301 and Advisory Committee Note, 56 F.R.D. 183, 208
(1973).  Under this proposed rule, a presumption would have
shifted the burden of persuasion.  Id.

Congress, however, rejected this proposal.  The House
of Representatives instead adopted a rule that represented an
"intermediate position" between the "Thayer" and "Morgan"
theories.  H.R. Rep. No. 93–650, 93d Cong., 1st Sess. 7 (1973),
reprinted in 1974 U.S.C.C.A.N. 7075, 7081.  The House rule
provided that "a presumption imposes on the party against whom it
is directed the burden of going forward with the evidence, and,
even though met with contradicting evidence, is sufficient proof
of the fact presumed to be considered by the trier of fact."  120
Cong. Rec. 2370 (1974).

In the Senate, the Advisory Committee and the Judicial
Conference's Standing Committee on Practice and Procedure
advocated a return to the originally proposed version of Rule
301.  Dismissing the House compromise as conceptually unsound,
the committee argued that "[t]he basic choice is between the so-
called `bursting bubble' theory and one shifting the burden of
persuasion."  Reporter's Memorandum, for the Advisory Committee
on Evidence and the Standing Committee, to the Senate Judiciary
Committee, reprinted in 1 Weinstein's Evidence at 301–3.  The
Senate rejected the House approach and passed the present version
of Rule 301.  S. Rep. No. 93–1277, 93d Cong., 2d Sess.     ,
reprinted in 1974 U.S.C.C.A.N. 7051, 7056; 120 Cong. Rec. 37,085
(1974).

The Advisory Committee and the Committee on Rules of
Practice and Procedure then turned to the Conference Committee
and again urged the adoption of the originally proposed version
of Rule 301, arguing once more that "[b]asically the choice to be
made in treating the effect to be given presumptions lies between
giving them only the effect of a `bursting bubble' and giving
them the greater effect of imposing a burden of disproof once
evidence has established the conditions that call the presumption
into operation."  See 1 Weinstein's Evidence at 301–7.  However,
the Conference Committee recommended adoption of the Senate
version, Conf. Rep. No. 93–1597, 93d Cong., 2d Sess.    (1974),
reprinted in 1974 U.S.C.C.A.N. 7098, 7099, and this
recommendation was enacted.  120 Cong. Rec. 40,070, 40,897
(1974).

Rule 301 states:
In all civil actions and proceedings not otherwise
provided for by Act of Congress or by these rules, a
presumption imposes on the party against whom it is
directed the burden of going forward with evidence to
rebut or meet the presumption, but does not shift to
such party the burden of proof in the sense of the risk
of nonpersuasion, which remains throughout the trial
upon the party on whom it was originally cast.

Like the members of the McKenna panel and the other
previously mentioned authorities, I think that the most
reasonable interpretation of Rule 301 is that it incorporates the

"bursting bubble" theory.  The text of the rule supports this conclusion since it does not even hint that a presumption does anything but shift the burden of production.  If Congress had intended for a presumption to have any further effect, such as guaranteeing that the presumed fact would not be rejected at the summary-judgment or judgment-as-a-matter-of-law stage, I think that Congress would have said so in the text of the rule.  I do not think that Congress would have left it for the courts to divine, without any clue in the language of the rule, that a presumption should have such an important additional effect.

Furthermore, the legislative history suggests that Congress, advised that it was compelled to choose between the Thayer and Morgan approaches, adopted "the pure Thayer rule."  1 Weinstein's Evidence at 301-9.  Professors Wright and Graham disagree with this position based on a passage in the Conference Report.  See 21 Charles A. Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure §§ 5120 at 547 & n.27, 5126 at 609-10 & nn.23-24 (1977).  Discussing the consequences that follow when the adverse party meets its production burden, the Conference Report states:

> If the adverse party does offer evidence contradicting the presumed fact, the court cannot instruct the jury that it may presume the existence of the presumed fact from proof of the basic facts.  The court may, however, instruct the jury that it may infer the existence of the presumed fact from proof of the basic facts.

Conf. Rep. 93-1597, supra, at   , reprinted in 1974 U.S.C.C.A.N. at 7099 (emphasis deleted; emphasis added).  Because the highlighted sentence discusses jury instructions, Professors Wright and Graham view it as showing that the Conference Committee contemplated that a presumption, even if met with enough counterproof to satisfy the adverse party's production burden, would nevertheless serve to take the factual question to the jury.  21 Wright and Graham, supra, § 5126 at 610 n.23.

Like the Sixth Circuit, In re Yoder Co., 758 F.3d at 1119-20 n.13, I do not find this interpretation compelling.  The Sixth Circuit wrote:

> The emphasized portion of this quotation is not inconsistent with the bursting bubble theory. . . . The statement that the jury may be instructed to consider an inference is most naturally read as permitting such an instruction when called for by the existence of a logical inference.

Id. (emphasis in original).  This reading is at least as reasonable as the alternative offered by Professors Wright and Graham, and I am therefore unwilling, based solely on the statement in question, to conclude that Rule 301 was intended to give presumptions an important effect not mentioned in the text of the rule.

I must acknowledge that a passage in Hicks may be read as supporting Professors Wright and Graham's argument, at least with respect to the McDonnell Douglas presumptions.  Hicks stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination,4/ and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required."

> 4/ Contrary to the dissent's confusion-producing analysis, post, at 535–536, there is nothing whatever inconsistent between this statement and our later statements that (1) the plaintiff must show "both that the reason was false, and that discrimination was the real reason," infra, at 515, and (2) "it is not enough . . . to disbelieve the employer," infra, at 519. Even though (as we say here) rejection of the defendant's proffered reasons is enough at law to sustain a finding of discrimination, there must be a finding of discrimination.

509 U.S. at 511 (all emphases in original) (ellipsis in

original).

Read in isolation, this passage may seem to suggest that the facts underlying the prima facie case plus the rejection of the employer's explanation are always sufficient to take the case to the jury. This is the interpretation adopted in Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), and by the majority here. See Maj. Op. 11–12. However, like the First, Fifth, and Eleventh Circuits, I do not think that this reading is compelled. See Isenbergh, 97 F.3d at 442–45; Rhodes, 75 F.3d at 993–95; Woods, 30 F.3d at 260–61 n.3. Instead, I believe that this passage can reasonably be interpreted as simply rejecting the "pretext plus" approach that Justice Souter attributed to the Court in his dissent (509 U.S. at 535 (Souter, J., dissenting)) to which the Court referred. 509 U.S. at 511 n.4. Under the "pretext plus" approach, as summarized in the law review article that Justice Souter cited, "the plaintiff must produce some additional evidence other than the evidence supporting the prima facie case and other than the fact of the defendant's deception." Catherine J. Lanctot, The Defendant Lies and the Plaintiff Loses: The Fallacy of the `Pretext-Plus' Rule in Employment Discrimination Cases, 43 Hastings L.J. 57, 87–88 (1991). The previously quoted passage from Hicks may be interpreted to mean that such additional proof (i.e., the "plus" in "pretext plus") is not always required. Accordingly, when the Court wrote (509 U.S. at 511) that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination," what the Court may have meant is

that the trier of fact is permitted to draw such an inference -- in the sense that the trier of fact is not precluded by any legal rule, such as "pretext plus," from doing so -- if such an inference is factually warranted.  The same interpretation may be given to the Court's subsequent statement that "upon [the] rejection [of the defendant's proffered reason] `[n]o additional proof of discrimination is required,'" 509 U.S. at 511.  "`No additional proof is required'" in that there is no blanket legal requirement of such proof, as there would be under the "pretext plus" approach.  Similarly, the "rejection of the defendant's proffered reasons is enough at law to sustain a finding of discrimination" (id. at 511 n.4) in the sense that no other blanket legal requirement, such as proving the "plus," is needed. I favor this interpretation because it is consistent with my conclusion, discussed above, that Rule 301 presumptions in general and the McDonnell Douglas presumption in particular are governed by the "bursting bubble" theory.

D.  If it is true, as I believe, that the McDonnell Douglas presumption is governed by the pure "bursting bubble" theory, it follows that the majority's blanket rule barring summary judgment or judgment as a matter of law in favor of the defendant is unsound.  It is well recognized that under the pure "bursting bubble" theory, once a presumption is destroyed, the proponent of the presumption has no guarantee that its case will go to the trier of fact.  One treatise states that the previously presumed fact may then be found "only if the natural probative force of the basic facts that brought the presumption into play is sufficient to support such a finding (or the evidence as a whole supports it).  Otherwise, the presumed fact may not be found, and the presumption does not protect this possibility."  1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence§ 70 at 332 (1994) (emphasis added).  Another observes:  "The opponent of the presumption may still not be entitled to a directed verdict, but if its motion is denied, the ruling will have nothing to do with the existence of a presumption."  2 McCormick on Evidence, § 344 at 462.  See also 21 Wright and Graham, Federal Practice § 5122 at 564.  In Thayer's words, after the presumption is spent, "[a]ll is then turned into an ordinary question of evidence."  Thayer, Preliminary Treatise at 346.

III.

Once it is recognized that the McDonnell Douglaspresumption disappears in the face of sufficient counterproof, the test to be applied in ruling on a defense motion for summary judgment or judgment as a matter of law is clear: the motion should be granted if all of the evidence in the record and the inferences that may be drawn from that evidence could not persuade a rational trier of fact that intentional discrimination on the ground alleged by the plaintiff was a determinative cause of the challenged action.  This test follows from the following three rules:

1.  In a McDonnell Douglas case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253; see also Hicks, 509 U.S. at 507.

2.  This burden requires proof that discrimination on the ground alleged was a determinative cause of the challenged action.  Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995) (in banc).

3.  Summary judgment and judgment as a matter of law are proper where a trier of fact could not rationally return a verdict in favor of the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).

Putting these rules together, it is apparent that a defense motion for summary judgment or judgment as a matter of law should be granted where a trier of fact could not rationally find based on the record (and giving no further consideration to the presumption as such) that discrimination on the ground alleged was a determinative cause of the challenged action.

The majority, however, takes the position that such a motion must be denied whenever there is enough evidence to support a finding that the explanation offered by the employer is untrue.  See Maj. Op. 13.  This position can be correct only if proof that is sufficient to justify disbelief of the employer's explanation (the majority's test) will always be enough to justify a finding by a rational trier of fact that discrimination on the ground alleged was a determinative cause of the challenged action.  Unless this relationship invariably holds true -- and I will show below that it does not (see part VI, infra) -- the majority's blanket rule is wrong.

V.

Before turning directly to that question, however, it is helpful to examine the types of evidence of discrimination that may exist in the record of a discriminatory-treatment case after the McDonnell Douglas presumption is burst and sufficient evidence to show pretext is offered.  This evidence may be grouped into four categories.

A.  First, there are the facts that the plaintiff proved to make out the prima facie case and the inferences to which those facts naturally give rise.  In some cases, the "natural probative force" of these facts is substantial, but in others it is relatively weak.  "The burden of establishing a prima facie case of disparate treatment is not onerous," Burdine, 450 U.S. at 253, and "evidence sufficient to make out a prima facie case is not always sufficient to support the ultimate finding of intentional discrimination. . . .  Where the evidence behind the prima facie showing is strong, it may, standing alone, justify a finding of intentional discrimination. . . .  But where the prima facie case is based on minimal evidence, it cannot." United States v. Redondo-Lemos, 27 F.3d 439, 442 (9th Cir. 1994).

An example which the prima facie case gives rise to only a weak inference of discrimination is the age discrimination case in which a somewhat younger person is hired, promoted,

retained, etc. instead of a slightly older person.  Under our cases, a plaintiff in an age discrimination suit can make out a prima facie case by showing that he or she (1) was over 40 years of age at the time in question, (2) applied for and was minimally qualified for the job, (3) but was rejected (4) in favor of a person who was "`sufficiently younger to permit an inference of age discrimination.'"  Barber v. CSX Distribution Services, 68 F.3d 694, 698 (3d Cir. 1995), quoting Fowle v. C & C Cola, 868 F.2d 59, 61 (3d Cir. 1989).  With respect to the final element of this formulation, we have held that an eight-year gap is enough and have suggested that a five-year difference may suffice.  Barber, 68 F.3d at 695.  Thus, I believe that a plaintiff claiming that he or she was denied a promotion due to age discrimination could make out a prima facie case under our circuit law by showing, for example, that he or she (1) was 43 years old at the time in question, (2) had the minimum requisite qualifications, (3) and applied for the job, but that (4) the employer instead chose a 35-year old.

I agree that these facts permit an inference of age discrimination, but I do not think that a reasonable person could give these facts, standing alone, much weight.  A way to test this hypothesis is to ask: if you knew nothing more about this promotion decision, how much would you bet that, when all the facts were revealed, the reason for the decision would turn out to be age discrimination?  I think that few people would be willing to wager much on this bet -- precisely because the natural probative force of the few facts needed to establish the prima facie case is slight.

A similar situation can arise in cases of alleged national origin or religious discrimination.  In order to make out a prima facie case of discrimination on these grounds, a plaintiff must show that he or she (1) is a member of a national origin group or adherent of a religion, (2) applied or was considered for the position or benefit, and (3) was at least minimally qualified, but (4) the position or benefit went to a person of another national origin or religion.  See, e.g., Vitug v. Multistate Tax Comm'n, 88 F.3d 506, 515 (7th Cir. 1996) (plaintiff established a prima facie case by showing that he was a qualified Filipino Catholic and that promotion went to "a non-Filipino and born-again Christian").  How strong an inference of national origin or religious discrimination naturally arises from such a bare showing?

Suppose that all that you knew about an employment decision was that the employer rejected an applicant who traced his or her national origin to one country and instead chose another person who did not trace his or her national origin to that particular country.  How confident would you be that the reason for the decision, when all the facts were revealed, would turn out to be national origin discrimination?

Or suppose that all that you knew about an employment decision was that the employer rejected a minimally qualified Protestant, Catholic, Jew, Muslim, or adherent of another religion in favor of another employee of a different religion. How confident would you be that the reason for the decision, when

all the facts were revealed, would be intentional discrimination on the basis of religion?  In my view, most rational people, without knowing more, would have little confidence that the real reason would turn out to be national origin or religious discrimination, and I therefore submit that these bare facts naturally give rise to only a slight inference of discrimination. And, although I will not belabor the point by posing further examples, I think that the natural probative force of the prima facie case is sometimes weak in race and gender cases as well. In short, I submit that the natural probative force of the facts underlying the prima facie case varies from case to case and that in some cases that force will be too weak on its own to sustain a finding of discrimination.

B.  Second, there is the inference of discrimination that may often be drawn from the ruling out of the employer's explanation.  The degree to which such an inference is justified, however, is inversely proportional to the degree to which the record contains evidence of a third possible explanation for the challenged employment action.  For example, if it is certain that an employee was discharged for either reason "a" or reason "b" and no other, and if reason "b" can be ruled out, then obviously it may be inferred that the real reason for the discharge was "a."  But if an employee was discharged for either reason "a," reason "b," or reason "c," then ruling out reason "b" does not necessarily permit a strong inference that reason "a" was the real reason.

Cases in which the record contains strong evidence of a third explanation for the challenged action are by no means unknown.  See Miller v. CIGNA Corp., 47 F.3d 586, 597 (3d Cir. 1995).  Perhaps the clearest examples are cases in which the plaintiff challenges a single adverse employment action based on two or more alternative grounds, a rather common tactic.  See, e.g., Roxas v. Presentation College, 90 F.3d 310 (8th Cir. 1996) (plaintiff alleged race, national origin, gender, and age discrimination); Lawrence v. Nat'l Westminster Bank of N.J., 1996 WL 589189, No. 95-5603 (3d Cir. Oct. 15, 1996); Rabinovitz v. Pena, 89 F.3d 482 (7th Cir. 1996) (age, religion, and retaliation); Ford v. Bernard Finesan Dev. Ctr., 81 F.3d 304 (2d Cir. 1996) (race, age, and gender); Hartsel v. Keys, 87 F.3d 795 (6th Cir. 1996) petition for cert. filed, 65 U.S.L.W. 3267 (U.S. Sept. 24, 1996) (No. 96-486) (age, gender, and retaliation); Evans v. Technologies Applications & Ser. Co., 80 F.3d 954 (4th Cir. 1996), (age and gender); Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875 (4th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3181 (U.S. Aug. 28, 1996) (No. 96-337) (gender and disability); Americanos v. Carter,  74 F.3d 138 (7th Cir. 1996), cert. denied, 116 S.Ct. 1853 (1996) (age, gender, and national origin); Castillo v. Frank, 70 F.3d 382 (5th Cir. 1995) (age, gender, and national origin); Meinecke v. H & R Block, 66 F.3d 77 (5th Cir. 1995) (age and gender); Johnson v. Office of Senate Fair Employment Practices, 35 F.3d 1566 (Fed. Cir. 1994) (gender and religion); Dashnaw v. Pena, 12 F.3d 1112, 1114 (D.C. Cir. 1994), cert. denied, 115 S.Ct. 417 (1994) (age, national origin, religion, and race); Sarsha v. Sears, Roebuck &

Co., 3 F.3d 1035 (7th Cir. 1993) (age and gender).

To take one of the many possible combinations of claims, an employee might contend that he or she did not get a promotion (1) because of gender and (2) because of disability. If the record in such a case contains strong evidence of disability discrimination, rejection of the employer's explanation (let us say, inferior qualifications) will not by itself permit a strong inference that the employer's true reason was gender discrimination.

The degree to which a trier of fact can reasonably conclude that there was discrimination on the ground claimed by the plaintiff also depends upon the degree to which the trier of fact can reasonably reject the employer's reason(s). (It is important to bear in mind that acceptance or rejection of an employer's reasons need not be an all-or-nothing proposition.) The evidence in a particular case may be such as to justify only a marginal or partial disbelief or belief of the employer's reason(s). For example, a trier of fact might be justified in believing that it is more probable than not (but barely so) that the employer's explanation is false. Or, a trier of fact might be justified in believing that it is more probable than not (but barely so) that the employer's explanation is true. In addition, a trier of fact might be justified in believing that the reason asserted by the employer was not the sole cause but was a partial cause (say a 20%, 40%, 60%, or 80% cause) for the challenged action. Or, if the employer asserts multiple reasons, the evidence might be such as to justify belief (to some degree) of some reasons but not others. All other things being equal, the more strongly and completely the trier of fact can rationally rule out the employer's reason(s), the more justified it is to conclude that there was discrimination on the ground alleged -- and vice versa.

C. Third, disbelief of the employer's explanation may also give rise to an inference that the employer was trying to conceal discrimination on the ground that the plaintiff claims. But the strength of this inference, too, will vary based on the facts. Its strength will depend on whether there is evidence in the record of some other possible explanation that the employer might not want to disclose (e.g., in my prior hypothetical, disability discrimination). In addition, its strength will obviously be proportional to the extent and strength of the trier of fact's disbelief of the employer's reason(s).

D. The fourth category consists of any other relevant evidence of discrimination on the ground asserted. "[S]tray remarks in the workplace" that are insufficient to make out a Price Waterhouse case are an example. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). When evidence falling into this category is present, it should always be taken into account in determining whether a defense motion for summary judgment or judgment as a matter of law should be granted -- something that the Fuentes test does not accomplish, as I will show below. See infra at 28-29. But of course, many McDonnell Douglas cases lack evidence of this sort.

VI.

Having surveyed the types of evidence of discrimination that are relevant for present purposes, I return to the question whether there will always be enough evidence to support a verdict of discrimination on the ground alleged by the plaintiff after the McDonnell Douglas presumption has burst and sufficient evidence of pretext has been adduced. To ensure that I am not misunderstood, I emphasize again that I think that under these circumstances there will usually be sufficient evidence -- but not always. Specifically, where the natural probative force of the facts offered to prove the prima facie case is weak, where there is strong evidence in the record that the challenged employment action was attributable to some factor other than the discriminatory ground alleged by the plaintiff or the explanation offered by the employer, and where there is no other evidence that the action was due to discrimination on the ground alleged, the evidence of discrimination on that ground may be insufficient to sustain a verdict and thus insufficient to defeat summary judgment or judgment as a matter of law.

Here is an example. A man with a disability applies for a promotion, but the promotion is given to a woman without a disability. See, e.g., Antol v. Perry, 82 F.3d 1291 (3d Cir. 1996)(man who was denied promotion sued for gender and disability discrimination). The plaintiff establishes a prima facie case of gender discrimination by showing that he is a man, he was qualified for the job, he applied, but it was given to a woman. There is no other evidence of gender discrimination against men; indeed, there is evidence that the decisionmaker was a man and that the great majority of the employees in the job category at issue were men. The employer says that the woman was chosen because her qualifications were better, but the plaintiff shows that this explanation is full of holes. In addition and most important, there is strong, direct evidence that the decisionmaker was biased against the plaintiff because of his disability. Among other things, there is testimony that, when the decisionmaker learned that the plaintiff had applied for the promotion, the decisionmaker made insulting and derogatory remarks about the plaintiff's disability.

Is there enough evidence in this case to convince a rational trier of fact that the promotion decision was based on gender discrimination? I think not, and if I am right, then the majority's blanket test is disproven. Consider the evidence in each of the four categories that I previously described. The facts underlying the prima facie case of gender discrimination -- basically that the plaintiff was qualified but a woman was given the job instead -- have little natural probative force for the purpose of showing gender discrimination; a qualified man might be rejected in favor of a woman for many other reasons. As for the evidence that the employer's explanation (the woman's supposedly better qualifications) was untrue, ruling out the employer's explanation still leaves both gender and disability discrimination as possible explanations, and in light of the strong evidence of disability discrimination, does little to show

gender discrimination.  Likewise, while the employer's conduct in proffering a false explanation permits an inference that the employer's real reason was one that it wished to hide, that inference does little to show that the employer's real reason was gender discrimination because there is strong evidence of another explanation (disability discrimination) that the employer would also have a motive to conceal.  Therefore, I submit that the evidence in this hypothetical case is insufficient to support a reasonable finding of gender discrimination and that that theory should be weeded from the case before the plaintiff's claim of disability discrimination is sent to the trier of fact.

The majority's test, however, would require that the gender discrimination claim be sent to the trier of fact as well.  Indeed, if the plaintiff had added claims of age, race, national origin, and religious discrimination and was able to do the minimum necessary to establish a prima facie case on all of those grounds, all of those claims would have to be sent to the trier of fact as well.  I do not think that such results can be squared with the cardinal rules that the plaintiff in a discriminatory treatment case must prove intentional discrimination on each ground alleged and that summary judgment or judgment as a matter of law must be granted if the record does not rationally support a judgment for the non-moving part on each such ground.  See, e.g., Deborah C. Malamud, The Last Minuet:  Disparate Treatment After Hicks, 93 Mich. L. Rev. 2229, 2306-2311 (1995).


                                    VII.
Recognition of what I believe is the correct test would clarify the analysis of discriminatory-treatment cases and would avoid analytical difficulties that the majority's test creates.  I will discuss two of these difficulties here.

A.  The first concerns cases in which the employer offers a multi-part explanation for the challenged action.  The Fuentes opinion, which the majority follows, first states that, when an employer asserts that the challenged action was taken for several reasons, the evidence "must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action . . . ."  32 F.3d at 764 (emphasis in original) (citations omitted).  However, Fuentesqualifies this statement by adding that "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder."  Id. at 764 n.7 (emphasis added).

I am not sure what these rules mean.  What is the difference between "several reasons" and "a bagful"?  What is a "fair number" of a "bagful"?  If the employer offers three reasons, each of which, it says, was equally important in the challenged decision, how many must the plaintiff knock down?  All of them?  Or will two suffice?  (I assume that one would not be a "fair number.")  What if the employer says that reason one was the most important, counting for, say, 40%, and that reasons two

and three each counted for 30%?  Would it be enough for the plaintiff to refute reason one?  If so, would refuting reason two by itself also suffice?  Why?  I don't know, and I don't think that it is possible to provide a satisfactory answer to questions of this sort within the framework of the majority's test.

By contrast, these problems disappear if what I contend is the correct test is used.  No matter how many reasons the employer offers and no matter what combination of reasons the plaintiff succeeds in knocking down, the dispositive question remains the same: taking into account all of the evidence in the record, including whatever inferences and deductions can rationally be drawn from the rejection of some (or all) of the employer's proffered reasons, is there enough proof to permit a rational trier of fact to find that intentional discrimination on the ground alleged was a determinative cause of the challenged action?

B.  The second analytical difficulty concerns the ability of a plaintiff to survive summary judgment or judgment as a matter of law by combining the evidence that necessarily remains after the McDonnell Douglas presumption has burst and sufficient evidence of pretext has been offered (the facts underlying the prima facie case and the inferences that logically flow from the rejection of the employer's explanation) with any other direct and circumstantial evidence of discrimination that the plaintiff may be able to find.  Under Fuentes, a plaintiff may defeat summary judgment or judgment as a matter of law by "either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Fuentes, 32 F.3d at 764 (emphasis in original).

Why can't a plaintiff potentially satisfy his or her burden by combining some evidence from each of these categories?  For example, if a plaintiff can almost, but not quite, show enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to come within the first part of this test, id. at 765, why can't the plaintiff make it over the hump by adding a bit of evidence from the second part, i.e., other direct or circumstantial evidence of discrimination?  Fuentes doesn't explain, and I don't think that any good explanation is possible.

In sum, I submit that the majority's test is both wrong and unwieldy and that the correct test is simply whether a rational trier of fact could find, based on the record, that discrimination on the ground alleged was a determinative cause of the challenged employment action.

VIII.

Applying this test, I agree with the district judge's analysis of the record.  The record shows great personal friction between the plaintiff and her supervisors regarding matters such as grooming, smoking, tardiness, and giving away free food and

beverages, but the district judge saw little if any evidence of any kind that could reasonably link this personal animosity to the plaintiff's gender. The district judge wrote that she was "left searching the record for evidence that gender played a determinative role in defendant's conduct."

In reaching the opposite conclusion, the majority apparently relies on the following: (a) "no woman had ever held the position of Manager of Restaurants," (b) "a man replaced Sheridan as Head Captain of the Green Room morning shift," (c) "Amblard had told Sheridan he would watch her like a `hawk' and a `dog'," and (d) Amblard "ignor[ed] her and [spoke] instead to one of her male supervisors if one was present." Maj. Op. 7. But factor (a) gives rise to only a weak inference of gender discrimination because the plaintiff was found to be unqualified for the position of Manager of Restaurants. Factor (b) likewise gives rise to only a weak inference since two of the other four head captains were women. Factor (c) does not provide a link to gender; nor does factor (d). Is all of this evidence taken together enough to persuade a rational factfinder that the reason for the animosity between the plaintiff and her supervisors was gender rather than sheer personal antipathy? The district judge concluded that it was not, and I am inclined to agree with her analysis.

I also agree with the district judge's conditional grant of a new trial. The district judge applied the correct legal standard. She recognized that "[a] new trial cannot be granted . . . merely because the court would have weighed the evidence differently and reached a different conclusion." Sheridan II at 12 (quoting Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231, 1235 (E.D. Pa.), aff'd, 977 F.2d 568 (3d Cir. 1992)). Instead, the court stated, a new trial may be granted on the ground that the verdict was against the weight of the evidence only when the failure to do so would result in injustice or shock the conscience of the court. Id. Moreover, in assessing the evidence, the court recognized that disbelief of defendant's proffered reason was evidence of discrimination. Accordingly, I believe that the district judge applied the correct legal precepts in ruling on defendant's new trial motion, and because I do not think that she abused her discretion in granting the motion, I would affirm.