**Michael McGRATH**

v.

**LUMBERMENS MERCHANDISING CORP.**

**Civil Action No. 10–7513.**

United States District Court, E.D. Pennsylvania.

March 20, 2012.

Nancy C. Demis, Gallagher Schoenfeld Surkin Chupein & DeMis, Media, PA, for Plaintiff.

James F. Kilcur, Allison B. Newhart, Saul Ewing LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff Michael McGrath's complaint alleges that defendant Lumbermens Merchandising Corporation (herein "defendant," the "employer", or "LMC")[1] terminated him because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA")

---

1. We will, at times, refer to actions by LMC's agents as the actions of defendant alone.

and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA").

LMC filed a motion for summary judgment, to which McGrath responded. Defendant then filed a reply, and plaintiff filed a sur-reply. For the reasons set forth below, we will grant LMC's motion for summary judgment.

## I. *Factual Background*[2]

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." *Bello v. Romeo*, 424 Fed.Appx. 130, 133 (3d Cir.2011).

We will thus begin by reciting the undisputed facts in this matter. In so doing, we will keep in mind that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir.2009), and we should not credit statements in affidavits that "amount[ ] to (i) legal argument, (ii) subjective views without any factual foundation, or (iii) unsupported assertions made in the absence of personal knowledge." *Reynolds v. Dep't of Army*, 439 Fed.Appx. 150, 152 (3d Cir.2011).

The parties agree on the essential details of McGrath's employment history with LMC. Defendant, headquartered in Wayne, Pennsylvania, is the largest forest products and building materials buying group in the United States. LMC's 365 member-owners ("shareholders") are an exclusive network of independent lumber-yard companies. On July 31, 2000, when he was fifty-one, McGrath began his employment with LMC in the Wayne headquarters as a trader/buyer ("trader") in the Lumber Commodities Division in the Eastern Spruce Department (the "department"). McGrath worked for LMC for about seven-and-a-half years until he was terminated in a reduction-in-force ("RIF") on February 4, 2008.[3]

As a trader, McGrath was responsible for fielding calls from LMC's shareholders, advising them on the lumber products markets, and buying products and supplies for them. McGrath reported directly to Jim Lefever, Department Manager for the Eastern Spruce Department. Lefever reported to Fred Ashman, the Purchasing Manager until 2004 when John Raffetto assumed the Purchasing Manager role for the Western and Eastern Spruce Departments. Plaintiff reported to the Purchasing Manager about once a month.

Since the start of McGrath's employment with LMC, management thought him to be a disruptive influence at work. In addition, management consistently noted that he was contentious, abrupt, and intimidating. Def.'s Facts ¶ 9; Pl.'s Answer ¶ 9. McGrath acknowledges that during the course of his employment with LMC, managers discussed with him his curt and abrupt manner with dealers and vendors.

---

**2.** For purposes of clarity, we will refer to the record as follows: Defendant's Statement of Undisputed Facts ("Def.'s Facts"), Plaintiff's Answer to Defendant's Undisputed Facts ("Pl.'s Answer"), Plaintiff's Statement of Disputed and Undisputed Facts ("Pl.'s Facts"), all other record evidence ("party, exhibit letter/number, page"), and, in the case of depositions ("Deponent's Name," Dep., page number:line).

**3.** It is undisputed, despite plaintiff's sometimes curious allusions to the contrary, that defendant's layoffs were, indeed, part of a RIF. Def.'s Facts ¶ 4; Pl.'s Answer ¶ 4. Thus, there is no need for us to consider here whether defendant terminated plaintiff in the course of a RIF.

In fact, he does not disagree with this description of his performance. Def.'s Facts ¶ 10 (citing Pl.'s Dep. 44:6–45:12); Pl.'s Answer ¶ 10. These concerns were reiterated in subsequent years on his annual performance evaluations, including the 2006 and 2007 evaluations. Pl.'s Exs. 8–11 (Exs. 10 & 11 describe plaintiff as "judgmental" and "intimidating", and note a lack of "patien[ce] with staff, mills and dealers" but also observe that he was improving some in these areas). These written evaluations were shared with McGrath in evaluation meetings.

In every review, Raffetto discussed plaintiff's aggressiveness, rudeness, inappropriate manner, and quickness to judge—including the 2007 review that was McGrath's last. Raffetto also had counseling sessions with plaintiff both inside and outside of the review process. Senior Management, including John Broomell, Senior Vice–President of Purchasing, and then-CEO Anthony DeCarlo, were generally aware of McGrath's deficiencies. Nevertheless, in 2007 McGrath and a colleague received a 5% discretionary bonus while two others received a 3% bonus. Pl.'s Facts ¶ 47. In 2006, plaintiff was promoted to a Buyer 3 status because he was "one of the stronger, more experienced Traders [Brokers] in the Division." Id. ¶ 48 (emphasis added).

In late 2006 and through 2007, LMC experienced a significant downturn in business as a result of the collapse of the real estate and construction industries. McGrath admits that he observed a "big cutback" in production in 2006 that led to his department suffering "the most severe drop in business". Def.'s Facts ¶¶ 29, 45; Pl.'s Answer ¶¶ 29, 45. As a consequence, senior management held a meeting in January of 2008 to discuss LMC's finances and expenses. DeCarlo instructed Broomell and Andrew Toombs (Vice–President for Purchasing) to decide what cuts were needed and report back to him. Def.'s Facts ¶ 34; Pl.'s Answer ¶ 34. McGrath specifically admits that Toombs approached Raffetto and they discussed the reduced volume in the department and agreed that it would be necessary to terminate employees. Toombs asked Raffetto to look at his staff and recommend employees for the RIF.

Raffetto recommended to senior management that McGrath be eliminated in a first wave of RIF layoffs because his deficiencies weighed in favor of dismissal even in light of his sales figures. Specifically, it is uncontroverted that Raffetto based his decision to include McGrath in the RIF based on plaintiff's attitude and lack of seniority at the company. Pl.'s Facts ¶ 40; Def.'s Answer ¶ 40. DeCarlo approved the recommendation to terminate McGrath because the justifications given "seemed plausible." Def.'s Facts ¶ 49; Pl.'s Answer ¶ 49. It is uncontested that DeCarlo did not know the ages of the individuals recommended for the RIF, and his deposition testimony reveals that neither Toombs nor Broomell informed him of McGrath's age.

On February 4, 2008, plaintiff and others were notified that they were being terminated. McGrath was not surprised that LMC was forced to conduct a RIF. Following his termination, plaintiff's duties were distributed among the remaining buyers. He was not replaced. Def.'s Facts ¶ 68; Pl.'s Resp. Facts ¶ 68.

During February and March of 2008, eight employees were terminated as part of the RIF. After the February/March RIF, LMC's sales numbers did not improve and LMC conducted a second RIF in October of that year. At that time Raffetto recommended that a thirty-five-year-old buyer from the department, Mark Thornton, be eliminated, along with eleven other employees.

## II. *Analysis*

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," *Adderly v. Ferrier*, 419 Fed.Appx. 135, 136 (3d Cir.2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." *Id.* " 'A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law,' " *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir.2011) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992)). A factual dispute is genuine " 'if the [record] evidence [taken as a whole] is such that a reasonable jury could return a verdict for the nonmoving party.... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff.' " *Bialko v. Quaker Oats Co.*, 434 Fed.Appx. 139, 141, n. 4 (3d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (bracketed material in original).

As already noted, we "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence."

*Eisenberry v. Shaw Bros.*, 421 Fed.Appx. 239, 241 (3d Cir.2011) (quotation marks omitted).

■ Plaintiff's claims under the ADEA[4] and the PHRA[5] are co-extensive and proceed under the burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2351–52, 174 L.Ed.2d 119 (2009) (rejecting "mixed-motive" theory in the ADEA context[6]); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir.2009) (in light of *Gross*, holding *McDonnell Douglas* still applies to ADEA claims); *Fasold v. Justice*, 409 F.3d 178, 183–84 (3d Cir.2005) (ADEA and PHRA proceed under *McDonnell Douglas* framework). *Gross* teaches that "[t]o establish a disparate-treatment claim under the plain language of the ADEA ... a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." 129 S.Ct. at 2350. The Supreme Court explained that this means "that age was the 'reason' that the employer decided to act." *Id.*

Under *McDonnell Douglas*, "an employee must first establish a prima facie case of discrimination, after which the burden [of production] shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold*, 409 F.3d at 184. A plaintiff then bears the burden of production to

---

4. The ADEA states in part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...." 29 U.S.C. § 623(a)(1).

5. The PHRA provides in part that: "It shall be an unlawful discriminatory practice ... [f]or any employer because of the ... age ... of any individual ... to refuse to hire or employ or contract with, or to bar or to

discharge from employment such individual ... or to otherwise discriminate against such individual ... with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual ... is the best able and most competent to perform the services required." 43 Pa. Stat. Ann. § 955(a) (West).

6. Thus, under the ADEA it is improper to consider whether age was a "motivating factor." *See Gross*, 129 S.Ct. at 2350–51, n. 3.

show that the employer-defendant's proffered reasons for termination are, in fact, pretextual. *Smith*, 589 F.3d at 691. Our Court of Appeals has clarified that "[t]hroughout this burden-shifting exercise, the burden of persuasion, including the burden of proving 'but for' causation or causation in fact, remains on the employee." *Id.* (internal quotation marks omitted).

■ In *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994), Judge Becker's opinion for the panel explained that

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not [the but-for] cause of the employer's action.

*Accord Hodczak v. Latrobe Specialty Steel Co.*, 451 Fed.Appx. 238, 241–42 (3d Cir. 2011) (reflecting modification to *Fuentes* and its progeny in light of *Gross* ). And "a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not [the but-for] cause of the adverse employment action." *Id.*

■ For our purposes here, we will assume that McGrath has carried his step-one *prima facie* burden of production. At step two, LMC has proffered two legitimate, non-discriminatory reasons for its decision to terminate plaintiff as part of the February 2008 RIF. First, LMC contends that McGrath "did not possess the seniority possessed by his peers—in most cases, he had half the seniority of his counterparts." Def.'s Mot. Summ. J. 26–27. Second, LMC avers that plaintiff "had issues that had been noted his employment—*i.e.*, he was abrupt, contentious, intimidating, inappropriate, and was not a team player." *Id.*

With the burden then shifting back to McGrath, we construe his arguments as contending that a reasonable jury could disbelieve LMC's proffered reasons for McGrath's termination. In the alternative, we must consider whether a reasonable jury could believe that an invidious discriminatory reason was more likely than not the "but-for" cause of defendant's decision to terminate McGrath. Upon our consideration of the record taken as a whole, McGrath simply does not carry his burden of production on the question of pretext at *McDonnell Douglas*'s third step for both his ADEA and PHRA claims.

### A. The "Disbelieve The Proffered Reasons" Arguments

■ Our Court of Appeals has explained that "[t]o show that an employer's legitimate reasons should be disbelieved, a plaintiff must offer evidence that would allow a fact finder to reasonably infer that '*each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action.' " *Marione v. Metro. Life Ins. Co.*, 188 Fed.Appx. 141, 144 (3d Cir.2006) (quoting *Fuentes*, 32 F.3d at 764) (upholding district court's grant of summary judgment in RIF ADEA case where plaintiff failed to carry burden at third step). To accomplish this pretext project, an employee-plaintiff must point to " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a reasonable fact-finder could rationally find them unworthy of credence' ". *Id.* (quoting *Fuentes*, 32 F.3d at 764). Put another way, an employ-

ee-plaintiff must point to " 'evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.' " *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir.2006) (emphasis in original) (quoting *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 467 (3d Cir.2005)).

In the face of LMC's two legitimate, non-discriminatory reasons for its decision to terminate McGrath, plaintiff has not pointed to *any* contradiction in the "core facts" that undergird LMC's proffered reasons. It is undisputed that McGrath was the least senior member in his department. Def.'s Facts ¶¶ 38, 40; Pl.'s Resp. Facts ¶¶ 38, 40. It is also undisputed that management repeatedly informed him that he lacked patience, could be excessively judgmental, and was at times intimidating to fellow traders. Def.'s Facts ¶¶ 9–12, 22, 40; Pl.'s Resp. Facts ¶¶ 9–12, 22, 40. The record is uncontroverted as to these "core facts". *See also* Raffetto Dep. 250:10–251:5.

Though McGrath avers that "[a] jury could reasonably conclude that [defendant] can justify any termination decision in hindsight where its procedures require that something negative be said in each review[,]" Pl.'s Facts ¶ 220, that generalization has no record support here. Even if we assumed LMC was obliged to record "something negative" on each evaluation

form,[7] the inconvenient truth is that as far back as 2002 plaintiff knew that his employer had concerns about his "curt and abrupt style with both dealers and vendors." Pl.'s Dep. at 44:1–20. McGrath also acknowledges that LMC's concerns carried over to subsequent years and were shared with him through his last performance evaluation before his termination. *See, e.g., id.* at 33–36. Notably, McGrath himself does not disagree with these descriptions. Def.'s Facts ¶ 10 (citing Pl.'s Dep. 44:6–45:12); Pl.'s Answer ¶ 10. Consequently, no reasonable jury could find that these justifications were conjured up *post hoc* as pretext because they have been on the uncontroverted record for years.[8]

In addition, McGrath contends that LMC proffers "contradictory or implausible explanations" for its decision to terminate him. McGrath tries to make much out of inconsistencies between what he contends LMC told the EEOC and what it now tells us. But plaintiff's own statement of facts betrays his argument. McGrath concedes that "[defendant] said [in its EEOC response that] [plaintiff] was terminated based on 'seniority and overall performance,' that he had the 'least seniority in the department.' It noted as an afterthought that [his] reviews were 'generally positive' but that he did have issues with fellow traders who felt intimidated by him,

---

7. Though McGrath does not explicitly limit this argument to the attitude-based reason for his termination, here it must be so. The "lack of seniority" reason is not a criticism that appears in plaintiff's review, nor is it a "shortcoming" that one would expect to find in such a review. Rather, it was a fact of LMC workplace life.

8. Plaintiff contends that though "Raffetto says he based the decision to cut [plaintiff] largely upon his seniority and ability to work as a team member[,] ... Raffetto's testimony is contradicted in numerous of [*sic* ] his evaluations of [plaintiff]. [Pl.'s Facts ¶¶ 28–51]." Pl.'s Resp. 3. Two sentences later, McGrath

characterizes Raffetto's testimony as an admission that he was lying. *Id.* First, McGrath points to *no* evidence in the record to support his contention that "Raffetto ... testifie[d] that he lied, repeatedly." *Id.* Second, though plaintiff's record citations focus on his success as a *trader*, it is nevertheless undisputed that since his 2004 review to his last review, McGrath was criticized as an impatient and excessively judgmental person and a troublesome communicator. Pl.'s Exs. 8–11. These undisputed core facts (and *not* plaintiff's success as a trader, *see* Pl.'s Facts ¶¶ 28–51) go to whether defendant's proffered legitimate, nondiscriminatory reasons constitute pretexts for discrimination.

and complained that he lacked patience." Pl.'s Facts ¶ 102 (citing Pl. Ex. 72 ("Def.'s EEOC Response")). Thus, McGrath's own summary of LMC's EEOC response reveals that the reasons the employer gave to the EEOC for terminating him are the same as what it gives now.

## B. *The "Believe Invidious Discriminatory Animus" Arguments*

In addition to failing to discredit LMC's proffered reasons, McGrath contends that he has pointed to three statements that "evidence ... bias against older employees" that could cause a reasonable jury to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of LMC's action. Pl's Resp. 13; *See* Pl.'s Facts ¶¶ 215–218, 221. We disagree.[9]

Our Court of Appeals has explained that for an employee-plaintiff "to show that discrimination was the likely cause of the adverse action, a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to 'unlawful discriminatory treatment,' that it had 'treated other, similarly situated persons not of his protected class more favorably,' or that it had 'discriminated against other members of his protected class or other protected categories of persons.'" *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir.2010) (quoting *Fuentes*, 32 F.3d at 765).

The first claimed evidence of bias is buried in paragraph 212 of plaintiff's recitation of facts, where he avers:

> DeCarlo testified that he include[d] the ages of [two] senior executives in their

---

9. In times too many to count, plaintiff's counsel routinely misstates record evidence and mischaracterizes facts. *Compare* Pl.'s Facts ¶ 24 ("Raffetto did not deny that McGrath was told in a performance review meeting ... that as part of the evaluation process at LMC, managers were required to say something negative.") *with* Raffetto Dep. 147 (Q: Did you ever tell Mike that you're required to think of something negative to say about every buyer? A: No.); *compare* Pl.'s Facts ¶ 42 ("Raffetto was sure McGrath received an average or better bonus.") *with* Raffetto Dep. 125:9–13 (Q: ... [D]id he receive a larger than average amount? A: *I don't know.* "I'm assuming he would have earned at least average or better." (emphasis added)); *compare* Pl.'s Facts ¶ 61 ("DiPietro's skills as a trader were so lacking that Raffetto wanted to demote him to assistant buyer in 2007.") *with* Lefever Dep. 16–17:9–20 ("I was losing mills, going out of business, and my territory was starting to get smaller.... they came to me again and said they were going to ... demote one of my traders, Joe DiPietro .... I didn't sleep at all that night ... what can I do to prevent my trader from being demoted ... they had said he wasn't performing up to par compared to the rest of the floor. So I did some research and discovered that a couple of the traders ... weren't performing as well as my guy .... I brought that to their atten-

tion and convinced them to keep my buyer a buyer[.]"). *See also* discussion in note twelve *infra*.

Other paragraphs of plaintiff's statement of facts contain illusory citations to the record. *See, e.g.,* Pl.'s Facts ¶ 66 (discussing DiPietro's 2007 allegedly negative review but actually citing to Thornton's 2007 review instead). Still other sections of plaintiff's response track language from plaintiff Catherine Eno's response to a pending motion for summary judgment before Judge Robreno in another case involving LMC. *See* C.A. No. 10–7514, docket no. 18 therein, p. 4. *Also see* Pl.'s Resp. 4 ("He says his role in supervising this department was to be disciplinarian so the managers on the floor would not have to, and yet says he shied away from confrontation with *McGrath* .... He says he tried to avoid confrontation but describes a meeting in January 2008 with the entire department in which he was very angry about having to work all weekend to fix certain computer entries." (citations omitted) (emphasis added)). This language also appears in Eno's response to a motion for summary judgment, although her name is substituted for McGrath's. Curiously, plaintiff retained a footnote in his response before us that discussed Eno's case. *See Id.* at 4 n. 3. Furthermore, McGrath points to no record evidence supporting the alleged January 2008 confrontation.

[20*09* ] evaluations to the board because he saw them as a [*sic* ] potential candidates to be his successor and, "[I wanted the board to have an understanding of where they were so that if the board]—I mean if somebody were 62, with only three or four years to go as president, they might say that's *not*[10] enough time." Decarlo Dep., Exh. "C" at 96, re: Plt. Exh. 25.

Pl.'s Facts ¶ 212 (footnote added); Pl.'s Ex. 25. McGrath also points to a statement made by one of LMC's agents about a subsequently terminated thirty-five-year-old employee in which the supervisor noted that he was "not sure about [the thirty-five-year-old employee's] *long-term potential;* needs more direct supervision." *Id.* ¶ 70 (emphasis added). He also points to a 1991 list of employee names and ages De-Carlo crafted (as a lower-level supervisor before he became CEO) as further evidence of age-based discriminatory animus. *Id.* ¶ 214.

But even giving the non-moving plaintiff the benefit of any reasonable inferences drawn from these facts, they do not even hint at discrimination *against McGrath* here, and:

> a rational jury could not say [the facts of record] are sufficient to show, by a preponderance of the evidence, that discrimination was more likely than not ... the [but-for] cause of [defendant's] actions. Nor do they suffice to discredit the nondiscriminatory reasons proffered by [defendant] by demonstrating such weaknesses in those reasons that a reasonable juror could rationally find them unworthy of credence[,]

*Anderson,* 621 F.3d at 279 (internal quotation marks and citations omitted).

■ First, DeCarlo's 20*09* statement post-dates McGrath's termination. It is merely evidence that he provided a different set of decisionmakers (the board) with one man's age, with no pejorative intimation. Moreover, DeCarlo only identifies the man's age and date of birth after noting his thirty-two-year tenure with the firm. Pl.'s Ex. 25 ("John completed 32 years with LMC on June 1, 2008 having started as a roofing buyer in 1976.... John turned 60 on February 5, 2008").[11] This statement, however, is unaccompanied by any reference to record evidence tying it to any of the board's employment decisions. More importantly, McGrath points to no evidence linking this 2009 statement to LMC's 2008 decision to terminate him. At bottom, this 2009 statement is of no probative value to a reasonable jury's deliberation on the question of whether LMC terminated McGrath because of his age. *See Hodczak,* 451 Fed. Appx. at 242 (agreeing with district court that statements that were temporally removed and about different subject matter were stray remarks entitled to little weight and thus insufficient to carry burden of production at third step).

■ Second, with nothing more, the evaluation of a thirty-five-year-old employee that expresses doubt about that employee's "long-term potential" at the company fails to show that this employee was treated more favorably than McGrath (in fact, this younger employee was terminated in the second RIF a few months later, undermining this contention, Def.'s Facts ¶¶ 63–65; Pl.'s Facts ¶ 73), was a member of

---

**10.** Significantly, McGrath's citation to this record omits this crucial word.

**11.** On the record here, the post-termination reference to John's thirty-two-years with the firm suggests nothing of age-based discrimi-

natory animus. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) ("When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears.").

some *other* protected category, or that the "long-term potential" remark had any nexus to the employee's age or—central to our inquiry here—LMC's decision to terminate McGrath supposedly because of his age.

Third, the 1991 list of employee names and ages, even if composed during another RIF year, is unaccompanied by any reference to record evidence showing that this by-then seventeen-year-old list guided any defendant-made age-based employment decision as to plaintiff or (for that matter) any other contemporary employee. Nor does it have probative value given its antiquity relative to McGrath's termination. *See Reich v. Schering Plough Corp.*, 399 Fed.Appx. 762, 765 (3d Cir.2010) (internal quotation marks omitted) (agreeing with district court that four and five year old "throw-away remarks were too removed in time and too *de minimis* to constitute direct or indirect evidence of age-based animus" so as to survive summary judgment (internal quotation marks and alterations in original omitted)). Moreover, McGrath points to no evidence suggesting that *his* name, age, or birthdate appeared on that seventeen year old list.

It is also important to note that McGrath admits that none of LMC's agents *ever* made any reference to his age at the time of his termination. Pl.'s Dep. 57:8–12. At bottom, he merely surmises: "what other reason could there have been" for his termination but his age? *Id.* 57:23–24. Such a rhetorical question on this record will not trigger ADEA or PHRA liability.[12]

---

**12.** Along a similar line of reasoning, Plaintiff submits that there is sufficient evidence for a jury to conclude that Toombs, who is quarterbacking LMC's response, exhibited the same bias toward older employees as DeCarlo articulated, *and then convinced his older subordinate to "fall on his sword" and take responsibility for the decisions*, and that the inconsistencies in their stories are the inevitable "tangled web we weave, when first we practice to deceive." Pl.'s Resp. 4 (emphasis added). We agree with LMC that "[n]ot only is there not sufficient evidence to support this fantastic theory, there is *no* evidence. There is nothing to show that Toombs, Raffetto, DeCarlo or anyone else at [LMC] had some type of bias towards older workers." Def.'s Reply 8. McGrath points to no evidence that Toombs convinced any subordinate to take responsibility for any decision here.

Furthermore, plaintiff's claim that Toombs "quarterbacked" defendant's response and took steps "to be sure everyone told the same story[,]" Pl.'s Facts ¶¶ 136, 139, are misleading. In support of this claim, McGrath contends that Toombs had "back and forth discussions with Raffetto to 'get the facts straight[.]'" *Id.* ¶¶ 136, 137, and "remind[ed] [defendant's witnesses] what had happened, ... [by] providing a 'refresher course ... just walk[ed] them] through the process just to remind them how the process had worked[,]'" *id.* ¶ 138. First, McGrath fails to point to the line immediately preceding this discussion in Toombs's deposition testimony: "Q: Did you discuss with them the *strategy or response* that [defendant] had adopted in this case? A: *No.*" Toombs Dep. 35:8–11 (emphasis added). Plaintiff's own record citation points to no evidence that Toombs ever discussed *the facts of this case* with *any* of the deponents. Second, the "get the facts straight" remark was taken from deposition testimony about Catherine Eno's claim, *not* McGrath's claim. *Id.* 80–84 (discussing defendant's response to Eno's EEOC complaint). Thus, this remark has no relevance to the matter here. *See also* Pl.'s Facts ¶ 140.

Regarding any subordinate-bias or "cat's paw" theory of discrimination, McGrath cites no record evidence suggesting that *any* of defendant's employees acted with age-based discriminatory animus. *See Marcus v. PQ Corp.*, 458 Fed.Appx. 207, 211, n. 3 (3d Cir. 2012) (internal quotation marks omitted) ("A 'cat's paw' or 'subordinate bias' theory of liability is one in which the plaintiff seeks to hold his employer liable for the animus of a nondecisionmaker."). Consequently, since there is no evidence that any LMC employees harbored a discriminatory animus, McGrath's "direct discriminatory animus" argument must fail whether asserted against decisionmakers or nondecisiomakers.

### The "Highly Successful In His Position" Argument

█ Under the heading entitled, "McGrath was highly successful in his position," plaintiff contends that he received nondiscretionary and discretionary bonuses and a promotion during his employment with LMC. Pl.'s Facts ¶¶ 42–46. This bonus and promotion evidence is inadequate to survive summary judgment here, even in light of our Court of Appeals's teachings in *Tomasso* and *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1073–74 (3d Cir.1996) (*en banc*) (arising under Title VII in a non-RIF context where the district court granted post-trial judgment as a matter of law against the verdict winner plaintiff despite denying summary judgment on same claim), that an "employee could show pretext *in part* by adducing affirmative evidence of her own accomplishments, including awards, a promotion, and a salary increase." 445 F.3d at 709 (emphasis added and internal quotation marks omitted)

Our Court of Appeals's reasoning acknowledges that this species of evidence *alone* will not suffice to establish a plaintiff's burden of production on the question of pretext at step three. *Id.* at 708–09 (after noting that plaintiff's evidence contradicted core facts, the Court observed that "[t]o be sure, [plaintiff] discredits [defendant's] rationale *in part* by pointing to external evidence[.]" (emphasis added)); *Sheridan*, 100 F.3d at 1074 (*"In addition to* the affirmative evidence of her own accomplishments" evidence was presented "directed to impeaching the credibility of [defendant's] witnesses" whose testimony was at the core of defendant's proffered legitimate, non-discriminatory reasons (emphasis added)). Thus, our Court of Appeals's reasoning elicits the question: in addition to the positive employment history, what comprises the rest of the evidentiary whole necessary to carry the burden of production on the threshold question of pretext under this theory? [13]

The need for *some* additional evidence beyond a positive employment history is especially warranted in the RIF context. *See Tomasso*, 445 F.3d at 710 n. 9. Our Court of Appeals has explained that "[i]n a RIF, a company is often forced to terminate the worst of the best, *i.e.*, an adequate or even high-performing employee who is under-performing relative to his peers." *Id.* at 711 (Roth, J., dissenting); *id.* at 710 n. 9 (majority opinion adopting this reasoning); *accord Marione v. Metro. Life. Ins. Co.*, 188 Fed.Appx. 141, 144 (3d Cir.2006) ("We recognize that in a RIF, a company is often forced to terminate 'the worst of the best,' and therefore an adequate employee who is under-performing relative to his peers may still be chosen for termination."). Judge Roth's opinion in *Tomasso* persuasively reasons that in analyzing an employer's disputed RIF decision, "subjective categories such as 'attitude' and 'teamwork' need to be viewed … in light of the fact that employers must distinguish otherwise competent employees" and thus

---

**13.** We are *not* interpreting our Court of Appeals as adopting a "pretext-plus" approach at the third step. It is well-settled that our Court of Appeals has expressly rejected such a showing. Instead, we read our Court of Appeals's teaching in *Sheridan* and *Tomasso* to hold that the evidence required to make the threshold showing of pretext requires evidence of a favorable employment history along with some other pretext-suggestive evidence. In other words, though no direct showing of discriminatory animus is required, displaying a favorable employment history plus the *prima facie* case will not get the plaintiff to the jury on the third step. This method of establishing pretext is in contrast, of course, to a situation where the employee points to evidence that contradicts the core foundational facts upon which an employer bases its proffered legitimate, nondiscriminatory reason.

"the margin of distinction between terminated and retained employees often shrinks." *Tomasso*, 445 F.3d at 711–12 (Roth, J., dissenting). This unfortunate but realistic aspect of RIFs suggests that "the employer's margin of appreciation to make a good faith mistake . . . must be respected" here. *Id.*[14]

Moreover, even outside of RIF contexts, our Court of Appeals has explained that a "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Fuentes*, 32 F.3d at 765.

The particulars of *Sheridan* and *Tomasso* explicate this point. In *Sheridan*, our Court of Appeals (in paragraphs spanning two pages of the *Federal Reporter*) painstakingly documented the employee's history of steady promotions and professional accolades that led right up until the time she lodged her complaint of sex discrimination. 100 F.3d at 1072–73 (listing professional accomplishments). The Court observed that record evidence showed that her employer "attempted to paint a different picture" of the employee's work performance only *after* Sheridan accused her employer of sex discrimination "[n]otwithstanding the record evidence of promotions and commendations". *Id.* at 1073. Thus, the employer's abrupt about-face supplied the additional evidence needed to supplement the consistent positive employment history to show pretext. This evidentiary reality led the Court to uphold the jury's verdict and reverse the district court's post-trial judgment as a matter of law. *Sheridan* relied heavily on *Fuentes* and our Court of Appeals justified its decision by stressing that the record was "clear that the jury . . . was faced with evidence on both sides of the issues raised by the parties." *Id.* at 1075.

In *Tomasso*, though our Court of Appeals found pretext on other grounds, it remarked (but did not hold on the facts of the case) that external evidence of satisfactory work performance could be adequate to show pretext. 445 F.3d at 708–09. Nevertheless, in suggesting that such "external evidence" may be enough to satisfy a plaintiff's step three burden of production, the Court compared differences in the employee's favorable performance reviews and an evaluation of his participation in a certain project at a time near his termination with the employer's termination-determinative evaluation form. For the first time, that form showed a lack of satisfaction with these same areas. 445 F.3d at 708–09. Again, such reasoning suggests that some cognate of about-face-like evidence against a record of positive work performance is needed to show pretext that will survive summary judgment.

In sum, our Court of Appeals's jurisprudence holds that a plaintiff's bonus and promotion evidence alone will not suffice to carry the step three burden of production—particularly in a RIF context. McGrath's argument on this ground fails because he points to no other evidence to support a threshold showing of pretext.

---

**14.** It is important to stress that the majority's opinion in *Tomasso* does not quibble with Judge Roth's reasoning on this point. To the contrary, Judge Becker's opinion "agree[s] with the dissent that a decision to lay off an employee in a RIF differs from a decision to fire an employee during ordinary circumstances." 445 F.3d at 707; *see id.* at 710 n. 9 ("[W]e agree with the dissent that the RIF provides context important to the layoff."). The majority opinion notes that "our disagreement with the dissent has nothing to do with an abstract debate about the role of context and everything to do with the facts of this case." *Id.* Thus, we cite Judge Roth's persuasive dissenting opinion to highlight the uncontroversial RIF-context-specific-inquiry that is decisive here.

The uncontroverted record evidence reveals that at the time of his termination McGrath was the least senior employee in his department and his evaluations had, for years, reflected his curt, abrupt, and intimidating work style. Even though he received a non-discretionary bonus [15] and at least one promotion during his tenure, McGrath's performance reviews continued to reflect LMC's concern for, and criticism of, his attitude up through his final review before termination. Since McGrath fails to point to any evidence beyond his one-time discretionary bonus and promotion history, he has not met the step three burden of production on the pretext question. In short, on this record there is only one side to the story.

In light of our consideration of the record taken as a whole, McGrath's ADEA and PHRA claims must succumb to summary judgment.

### ORDER

AND NOW, this 20th day of March, 2012, upon consideration of defendant's statement of facts and motion for summary judgment (docket entry # 14), plaintiff's answer to defendant's facts, counter-statement of facts, and memorandum in opposition thereto (docket entry # 16), defendant's reply thereto (docket entry # 18), and plaintiff's sur-reply (docket entry # 21), and upon the analysis set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Defendant Lumbermens Merchandising Corporation's motion for summary judgment (docket entry # 14) is GRANTED as to plaintiff Michael McGrath's ADEA and PHRA claims; and

2. The Clerk shall CLOSE this case statistically.

---

**15.** McGrath only points to evidence of a non-discretionary bonus paid for work done about four years prior to his termination. Notably, in the year that LMC paid this discretionary bonus, all of plaintiff's departmental colleagues received a bonus. *Id.* at 127:25–129:14.